# Staunton.

MARY A. HARMAN, WIDOW OF PEEL HARMAN, DE-
CEASED, v. ROBERT PEEL HARMAN, CHARLES RUFUS
HARMAN, MARY DOVIE DAY (NEE HARMAN), FOREST
MARRS HARMAN, PERLIE MAY POWERS (NEE HAR-
MAN), AND CATHERINE PEARL HARMAN (BEING ALL
OF THE CHILDREN OF SAID DECEDENT), THE LAST
THREE OF WHOM ARE INFANTS, AND S. S. F. HARMAN,.
EXECUTOR OF THE SAID DECEDENT.

September 18, 1924.

1.  DOWER—*Bar to Dower—Bar to Dower under Section 5123 of the Code of*
    *1919—Desertion as Well as Adultery.*—Before a widow can be barred
    of her dower in her husband's estate under section 5123 of the Code
    of 1919, it must be proven (a), that the wife of her own free will—
    *i. e.,* voluntarily—deserted her husband; and (b) that afterwards,
    when requested by him so to do, she refused to return to him, with-
    out just cause for such refusal.
2.  DOWER—*Bar to Dower—Bar to Dower under Section 5123 of the Code of*
    *1919—Desertion as Well as Adultery.*—The mere facts that the wife
    leaves the home and that her husband remains there do not make
    section 5123 of the Code of 1919 applicable.  If the leaving of the
    home by the wife is caused by such conduct on the part of the hus-
    band that the husband is guilty of constructive desertion of the wife,
    certainly where such constructive desertion consists of actual, physi-
    cal cruelty on the part of the husband, in such a degree as to cause
    the wife to leave, and justify her in leaving the home to protect
    herself therefrom, it is not a voluntary leaving—it is not a leaving
    of the husband "of her own free will" within the meaning of the
    statute.
3.  DOWER—*Bar to Dower—Bar to Dower under Section 5123 of the Code of*
    *1919—Desertion as Well as Adultery—Request to Return.*—It is true,
    however, that, although the leaving of the husband by the wife may
    have been caused by the cruelty of the husband, yet, if afterwards
    he requests his wife to return, and at the time of such request, or
    requests. reasonable ground for fear on the part of the wife of recur-
    ring cruelty to her on the part of the husband, if she should return.

to the home and again live with him there in the marriage relationship, no longer exists, and she, for some other cause, which would not have been a legal excuse for her original leaving, refuses to return, section 5123 of the Code of 1919 is applicable.

4. DOWER—*Bar to Dower—Bar to Dower under Section 5123 of the Code of 1919—Desertion as Well as Adultery—Case at Bar.*—In the instant case the testimony was uncontroverted to the effect that the drunken sprees of the husband were very frequent and continued during the whole period after his marriage until his death; that when the husband was on his drunken sprees he was a quarrelsome, disorderly, and dangerous man; and that his repeated and great cruelty to his wife while on such sprees finally caused her to leave his home and to thereafter remain away to shield herself from bodily harm from him which she reasonably apprehended.

  *Held:* That the wife did not of her own free will desert her husband, and when afterwards requested by him so to do, refused to return to him, without just cause for such refusal, and that section 5123 of the Code of 1919, in regard to dower barred by adultery and desertion of wife, was not applicable.

5. DOWER—*Bar to Dower—Bar to Dower under Section 5123 of the Code of 1919—Admissibility of Acts of Cruelty Prior to Final Separation.*—In a suit for assignment of dower, where it was contended that the wife was barred under section 5123 of the Code of 1919 in regard to dower barred by adultery of wife, to show that the wife's separation from her husband was not voluntary acts of cruelty of the husband to the wife were admissible though many of the acts of cruelty occurred a long time before the final departure of the wife; and that the wife returned and cohabited with the husband after all of them, except those which were inflicted upon her at the time of her final departure from the home, does not render the evidence of such repeated conduct any the less cogent in establishing the fact that such last departure of the wife from the home was not of her own free will.

6. WORDS AND PHRASES—*Cruelty—Divorce.*—Cruelty is cumulative, admitting of degrees and augmenting by addition; so that it may be condoned and even forgiven for a time, and up to a certain point, without any bar in sense or reason to bring it all forward when the continuance of it has rendered it no longer condonable.

Appeal from a decree of the Circuit Court of Tazewell county.   Decree for defendants.   Complainant appeals.

<em>Reversed and remanded.</em>

So far as material to be stated, the object of this suit, instituted in equity by the appellant, Mary A. Harman, against the appellees, is to have dower assigned to her in the real estate in the bill mentioned, of which her husband, Peel Harman, died seized and possessed.

The parties will be hereinafter referred to as plaintiff and defendants, in accordance with their positions in the court below, or by name, or as husband or wife, where reference is made to them.

The plaintiff and her said husband were legally married in July, 1896. The husband died in April, 1922, leaving a will which contained the following clause:

"I desire that Mary A. Harman, my wife, shall not have any part of anything I own as she left me or deserted me in 1918 without cause."

Among the issues made by the pleadings in the cause were the following:

Did the wife (a) of her own free will desert the husband, and (b) afterwards, when requested by him so to do, refuse to return to him, without just cause for such refusal?

The decree under review, entered on the merits, upon consideration of the depositions taken and filed in behalf of the plaintiffs and defendants, so far as material to be stated here, was as follows:

"*    *    the court being of opinion that the complainant is not entitled to the relief prayed for,    *    *    being satisfied from the evidence that the complainant, Mary A. Harman, of her own free will, left her husband, the said Peel Harman,    *    *    therefore it is adjudged, ordered and decreed that the said Mary A. Harman is barred of any dower in said estate    *    *    and it is further adjudged, ordered and decreed that the bill of complaint of the said Mary A. Harman be and it is hereby dismissed."

Only two of the defendants, by their pleadings, allege the affirmative of the said issues, namely, Robert Peel Harman, an illegitimate son of the said husband, and Charles Rufus Harman, who was one of the said children of the said husband and wife born of the said marriage. All of the other defendants (except Catherine Pearl Harman, who is the youngest of the infant defendants and who filed an answer by and of her guardian *ad litem* in the usual form), in their answer, allege the negative of the said issue and join in the prayer of the bill for the aforesaid relief sought thereby.

The evidence relied on by said two defendants, who allege the affirmative of said issues, to sustain such issues on their part, consists solely of their depositions and those of C. E. Harman, a brother of the said husband, and of W. F. Ross, who for a short time worked on the farm of the husband, and certain letters written in 1914, 1915, 1916, 1918 and 1919 by the husband and wife, filed with the deposition of the wife on cross-examination. The substance and character of such depositions (taken in September, 1922), so far as material on such issues, will appear from the following excerpts therefrom:

"Robert P. Harman.

"*Direct examination.*

"By Mr. Bowen:

"Q. Are you the same Robert P. Harman, one of the defendants in this suit?

"A. Yes, sir.

"Q. What is your age?

"A. Twenty-seven past.

"Q. Where were you at the time that Mary A. Harman left home and went to Bluefield to live?

"A. I was in the army.

"Q. How soon after she left was it before you came home?

"A. I came home the summer of 1919 and she left the fall before that, and she was out in April. In April, 1919, she was (not) at my father's home.

"Q. After you came back, did your father send you to Bluefield to see Mary A. Harman for the purpose of having her return home and live with him?

"A. Yes, sir.

"Q. Did you go to Bluefield and deliver the message?

"A. Yes, sir.

"Q. What answer did she give you?

"A. I told her what my father said, and she said she 'wouldn't live with the old son-of-a-bitch under no circumstances.'

"Q. While Peel Harman and Mary A. Harman lived together, please state whether or not he was affectionate with her?

"A. He was a good provider and good to her, and she had plenty of money to spend, but he was a little disagreeable when he was drinking.

"Q. During the last ten years that they lived together, please state whether or not at intervals she would leave him?

"A. Yes, sir; she would leave him most every summer.

"Q. How many times had she left him before the last time when she went to Bluefield, as well as you can recollect?

"A. In the spring of 1914 she left, went to Caretta and spent the summer.

"Q. How many other times, in a general way, can you remember that she would leave home?

"A. On a number of times. I remember four or five times she left.

"Q. When she would return, what excuse, if any, would she give for her conduct?

"A. She wouldn't give any. He would call her up and beg her to come home.

\*        \*        \*        \*        \*        \*        \*        \*        \*

"A. I got home on July 1, 1919.

"Q. And Mary A. Harman was not there at that time?

"A. No, sir.

"Q. Of course you don't know of your own personal knowledge just when she left your father's home and went to Bluefield?

"A. Only what he told me.

"Q. You do not know of your own knowledge any of the circumstances connected with her leaving your father's home and going to Bluefield, as you were not there at that time?

"A. No, sir.

\*        \*        \*        \*        \*        \*        \*        \*        \*

"Charles Rufus Harman.

*"Direct examination.*

"By Mr. Bowen:

"Q. You are one of the defendants in this suit?

"A. Yes, sir.

"Q. How old are you?

"A. I am twenty-one years old.

"Q. Before your mother left home and went to Bluefield, please state if during the last ten years of the married life of your father and mother if she didn't at frequent short intervals leave him about once a year and stay away from him about one week up to two or three months?

"Mr. Royall:   Excepted to as manifestly leading.

"A. Yes; she went off and stayed—about once a year—she stayed anywhere from two and three weeks to a month.

"Q. Would your father finally go after her or send some one for her?

"A. Yes; he would go or send somebody and try to get her to come back.

"Q. Was there really any cause for her leaving at those times, or did she leave of her own accord?

"A. She just went of her own accord.

\*        \*        \*        \*        \*        \*        \*        \*        \*

"C. E. Harman.

*"Direct examination.*

"By Mr. Bowen:

"Q. What is your age?

"A. I will be fifty-five or fifty-six.

"Q. Are you a brother of the late Peel Harman?

"A. Yes, sir.

"Q. How far did Peel Harman live from where you lived at the time of his death?

"A. Well; I should say about three miles from me, three and a half.   I wouldn't be positive about the distance.

"Q. Please state, during the last ten years of the life of Peel Harman, what was the conduct of his wife, Mary A. Harman, in regard to leaving his home at intervals and periods?

"A. Mary left several times.   I couldn't say how many times.

"Q. After she would leave each time, what would Peel Harman do?

"A. I think Peel would always try to go and get her back.

"Q. What was Peel's conduct towards loving her and being affectionate towards her?

"A. I would think Peel almost worshipped her. I think Mary knows that as well as I do.

"Q. After Peel would bring her home, would she stay there for any great length of time?

"A. She maybe would stay for a few months. I wouldn't want to say the length of time.

"Q. At the periods when she would leave him, about how long would she stay, on an average, before she would return?

"A. I wouldn't want to say. Sometimes maybe two or three months and sometimes maybe longer than that. I don't hardly know about the length of time she would be gone.

"Q. After she went to Bluefield in the fall of 1918, please state whether or not you were with Peel, in Bluefield, at the home of Mary A. Harman, and what efforts, if any, did Peel make to have her to return to his home in Tazewell county?

"A. I was there in Bluefield one day—I couldn't say what I was doing. I met Pearley May and she went on up to the house and told Peel and I believe Peel came on down and took me up, and I stayed maybe an hour or two. I couldn't say the exact time.

"Q. Did Peel Harman in your presence ask his wife, Mary A. Harman, to come and return to Tazewell county and live with him?

"A. Well, I think so, and I thought while we were there that Mary was going to come back right at once. They seemed to be friendly and I thought their little spat was made up and she was going on back home.

"Q. After she went to Bluefield, please state if Peel

Harman came to your home and made any statement to you and your wife in regard to making a deed to his wife conveying to her a half interest in all his real estste?

"A. Yes.

"Q. And if so, state what he said and what was done at that time and place?

"A. Yes, sir.

"Q. What did he say?

"A. He was writing a deed, deeding Mary one-half of his property over there. He thought she would come back and live with him.

"Q. I here hand you the draft of a deed, dated the 28th day of January, 1919, from Peel Harman, a party of the first part, to Mary A. Harman, party of the second part. Please examine this deed and state whether or not it is in the handwriting of Peel Harman?

"A. Yes; it is in the handwriting of Peel Harman.

"Q. Did he advise with you and your wife in regard to signing and acknowledging this deed, and also ask your opinion as to whether or not you thought his wife would live with him if he made her this deed?

"A. Yes, sir; he did.

"Q. What advice did you give him?

"A. I told Peel I thought it would possibly be a bad thing to do; that if him and Mary couldn't live together peaceably and agreeably as it was—I said: 'Suppose now you deed her half of your property and she leaves you, it will take the other half to pay your debts, and you wouldn't want to take a pick and shovel and go to the road like you did when you were young.' That might not be the exact words, but that is the sum and substance of it.

\*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. Please state, on the various occasions during the last ten years that Peel Harman and his wife lived to-.

gether, when she would leave home at periods and remain away from home, and when later Peel would go for her and she would return home, she ever stated any reasonable cause for leaving or not, or about what explanation would she give for her conduct?

"A. Well, now; I don't know whether I could say that I know that.

\*    \*    \*    \*    \*    \*    \*    \*

"W. F. Rose.

"*Direct examination.*

"By Mr. Bowen:

"Q. Did you live with Peel Harman in Tazewell county at the time his wife, Mary A. Harman, left and came to Bluefield?

"A. I was there a year beforehand and two years afterwards.

"Q. During the time you were there, please state if Peel Harman was a good, kind and affectionate husband to his wife and treated her well?

"A. Well; it always seemed to me that he was a fool about her.

"Q. Was he kind to her?

"A. It always seemed to me that he was kind to her while I was there.

\*    \*    \*    \*    \*    \*    \*    \*    \*

"*Cross-examination.*

"Q. You spoke of Mr. Harman being affectionate and devoted to his wife. You never saw him abuse her at any time while he was drinking or use rough language towards her, did you?

"A. Well; I wasn't with him very much. Of course, when he would get drunk he would say a little rough

things, but he wouldn't say more things to us fellows out than he would in.   He would talk to us right smart.

"Q. You were not at their home all the time when they were together?

"A. No, sir; I was working out on the place.

"Q. And you don't know what happened when you were away?

"A. No, sir; I would always come in and out to my work before they would get up of mornings.

"Q. You were only there just when you would come in to your dinner in the middle of the day, was that correct?

"A. I was just in mornings and nights.   I never took dinner very much with them, just now and then.   I generally boarded myself."

The letters of the husband, above referred to, were written at times when the wife was away from him, and express an earnest desire for her to return, and appeal to her to do so both on account of his own need and the need of the children for her care and attention.   There is but one letter of the wife among these letters, written during the period prior to the final separation; and among such letters there are but two of the husband written after 1915, and these two letters were written on the same day, May 21, 1919, which was shortly after the final separation.   The three letters just mentioned were as follows:

*"Exhibit Letter No. 4.*

"Bluefield, W. Va., April 13, 1918.
"Dearest Peel:
"I just feel like kicking myself for not writing you sooner.   But the weather has been so offul bad I haven't

got about very much and then I haven't been feeling at
all well.    I am going to come home tomorrow if nothing
happens.  If I dont come in the machine which I  don't
think the are going on account of bad weather.    You
may meet the 3 o'clock train Sunday, I am coming back
next week to operated on at least that is Dr. Scotts
advise, and I guess its best for me from what he says.
I have kindly been looking for you down.    But I guess
you have been busy looking after your lambs & things.
So if you dont come in today look for me tomorrow.
Love to all I want to see you so bad.        Mary."

*"Exhibit Letter No. 6."*

"North Tazewell, Va.
"May 21, 1919.
"Dear Mary—I thought this morning I would drop
you a few lines hoping they will find you well.    I am
not feeling the best.    Chas. & Coz. Linnie was up some
time back and I felt like then that I was not going to
write to you any more unless you wrote to me.    But I
had been in such good hopes of us getting along all
right until Hallett come and raised his row.    Well he
is so sorry about it.    Just as sorry as I am about our
trouble he told me he advised you to come home and
stay that was the best thing you could do.    He told me
that if I wanted you at home that I had better write
you and you would come.  I do not feel that I mis-
treated you but nevertheless if you feel that way I ask
forgiveness for any and all wrongs that I have done
you.    Two wrongs does not make one right.    Well
Mary I would love for to see you come home now and
stay just as bad as I ever did in my life.    Provided you
feel you can and will treat me as a wife should treat her
husband.    I feel that we would never have any more

trouble with Hallett although he will come home when he wants to. Now I would just be as glad to see you come home now as ever if you can treat me right I will do all in my power to make you feel at home if you decide to come. If you are coming to live with me please write if you are not please write also. The most part of our life is spent so I hope you can decide to come and make my house your home.

"Your loving husband

"Peel Harman."

*"Exhibit Letter No. 7.*

"May 21, 1919.

"Dear Mary:

"I have decided to write you a letter hoping these few lines may find you well. This leaves me just feeling common. Well Mary I would like to have a talk with you. My sister Dovie told you when she was in Bfd that I wanted to see you and you said you was too nervous to see me but would see me some other time. Well you write and let me know when you can come down home or to my sister Dovies or anywhere in Tazewell you want to see me or in Graham, Va. If you are coming on train I will meet it and take you anywhere for the talk let me know what time of day suits you.

"Your husband

"Peel Harman."

The evidence relied on by the plaintiff to rebut the above mentioned testimony for the said defendant sons and to sustain the negative of the aforesaid issue, consists of her own deposition and the depositions of her

two sisters, Mrs. Day, Mrs. Powers; of Mrs. Ellen Groseclose, who lived in the home of the plaintiff and her husband practically as an adopted child for seven years, from 1909 to 1916; of Mrs. Joana Harman, a sister-in-law of the plaintiff; and of Samuel Jones, who for a short time worked on the farm of the husband; and of three other witnesses, Mrs. Monday, John Monday and J. M. Bowling, who testified that the general reputation of the husband was that he was a quarrelsome and dangerous man when under the influence of liquor.   Such depositions were taken in December, 1922, and, so far as material on the issues mentioned, the substance and character of them will appear from what is said below.

Mrs. Mary A. Harman, the appellant, testified that she did not desert her husband without just cause in the year 1918, or at any other time, but that she was forced to leave her husband and his home repeatedly after the marriage in 1896, by the extreme cruelty of the husband, when on his drunken sprees, consisting of actual assaults and violence to her person of the most brutal nature on many of those occasions—as many as thirteen of such occasions being testified to in great detail as to time and place, what occurred and as to those who knew such facts in addition to herself.   According to appellant's testimony, this cruelty began as early as when the first child was about nine months old and continued at intervals during the period thereafter until on a certain occasion, in the year 1918 or 1919, it culminated in forcing her to leave finally the home of her husband because of his aforesaid cruelty— whether this last occasion was in 1918 or 1919 being left in some doubt by the evidence.   The testimony of the appellant on the subject is in so much detail and covers so much space that it will not be copied here.

However, the following extracts from her testimony with respect to the first, to two occasions after that, to the next to the last and the last of said occasions, and also as to the conduct of the husband towards others of his family and towards the appellant after she had finally left his home, will show the character of the aforesaid cruelty, the fear in which it put her, and the character of the testimony of the appellant on the subject:

"The first time I ever went from my home—was driven out—was when our son Hallett was a baby about nine months old. I had accidentally—I suppose you will call it that—left some lettuce on the table from supper and didn't remove it when we set down to breakfast, and he got mad and went to cursing and put me out of the house. We lived upstairs over the store building where he sold goods.

"Q. State where that was?

"A. That was at Burke, near Keystone. We lived there the first five years of our married life. It was raining, pouring down rain, and he pushed me and kicked me down those stair steps and when I got to the bottom of the stair steps there was a back porch and I got up and stood on the porch and begged him not to do it, and he knocked me off of the porch, knocked me into a puddle of water, and when I got up he picked up a rock and he knocked me down with this rock. It was a flat rock and if he had struck me with the edge of it I guess he would have killed me. He struck me with the flat side of it and knocked me down again with that. I got up and he told me to get away from there and he didn't want me there.

"Q. Where did you go at that time? Did you leave your husband's home or not?

"A. Yes; I had to go. I went down to Mrs. Lee

Evans'; lived about a block below us, and went in her house all wet and muddy.

"Q. How long did you stay at the home of Mrs. Evans and when did you return home?

"A. She gave me a bed. I was just shaking all over and cold and wet, and she gave me a nice warm bed, and I went to bed; and when Mr. White, who was clerking in Peel's store at that time, found out about it he come down and had Dr. Preston come up to see me. I was threatened with a miscarriage the next day, due he said to the mistreatment.

\*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. Did you return to your husband's home after this conduct on his part towards you?

"A. I went back the next day after I had sent him word and asked him if he would let me come back to my baby. That was Hallett.

\*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. Well; did you ever leave the home of your husband at any other time on Cavatt's creek, and if so, under what circumstances did you leave and where did you go?

"A. Well; Peel finally said if I would come and get my sister back and take her home with me that he would be good to me and let me stay at home, and as I stated that was just a short time before Pearlie Mae was born, as well as I remember, about three weeks, and of course I had to stay at home, and he was very good to me after that until Pearlie Mae was about nine months old; and one day, I don't remember what he got wrong about, I don't even remember if he was drinking that day, he run me off with a shot gun and I went as far as the first gate. He shot twice in the direction—he seemed to have his gun pointed towards me but I suppose he could have shot me if he had been

trying to. I went as far as the big gate and I didn't go any further, and when he come down to me he brought this shot gun on right close to where I was standing, and I said: 'Peel; you don't own the road,' and he said: 'I will kill you, you get down this road,' and I stood and throwed my hands up and said: 'For God's sake kill me, shoot me and kill me,' and he didn't shoot me that time, but he had shot through my skirt. Skirts were very wide at that time. And he didn't shoot me and he laid his gun down. He couldn't drive me any further, and he knocked me, he slapped me and kicked me on down that branch through that water. There is a branch there in the road quite a little ways, practically all the way from there down to where Aunt Mary Crockett lived at that time. When I got to the ford of the creek I asked him to please let me walk the foot log and he pushed me in this water and forced me to wade this creek. I went on and when I come to the next ford of the creek, which was just a few steps, he said you wait, you needn't go any further right now, you can have your horse. Aunt Mary Crockett, this colored woman, come out and begged him to let me come in her house. He said well I could go in there, and she gave me some dry clothes of her own, and it was in the winter time, in the month of December, and she gave me some dry clothes, and I warmed by her fire while he sent a colored man, uncle Luke we called him, to the house to get my horse.

\*      \*      \*      \*      \*      \*      \*      \*      \*

"Q. State whether or not you returned to your husband's home at that time, and if so, when?

"A. No; I got on my horse and rode him up town. I went to Shields Harman's house thinking he might protect me or let me stay there, so Shields didn't seem to want to have anything to do with family affairs, and so

I went from there on down to W. F. Harman's.    He lived down here in the lower end of town at that time and I asked them if I could stay all night, and Peel followed and come to their house.    I think that was the second night after I had been driven from home.

"Q. Well; did you go home with him then?

"A. And Peel come in so rough and was drunk and I got cousin Melia, that is Mrs. W. F. Harman rather, to let me have a room and to not let Peel in the room where I was, and W. F. Harman tried to get him to be quiet. He tried every room in the house; he come to the doors, he kicked the doors, and W. F. Harman was threatening him and so they sent for Shields Harman and Dr. Pierce, it seems to me they sent for these two men, and they went down, and I don't know why they didn't seem to manage Peel; couldn't do anything with him, but W. F. Harman said he knocked Dr. Pierce, slapped him over when he went to inject his arm with morphine; that he slapped Dr. Pierce over, but I don't know, I didn't see it; and they come on away and left him and then he got on his horse and said he would get him a jug of liquor and he would come back and he would come in the house and nobody would harbor his wife.    The next day I had a phone message from Reuben Harman that Peel Harman wanted to come up and talk to me.    I said I didn't want to see Peel, I am afraid of him.    Well; he insisted that I talk to Peel and that he would come with him and that him and Shields wouldn't let Peel hurt me.    I was as afraid of Peel Harman as I could be. I almost went into hysterics when he come and I got sight of him, but he came and I talked to him and Shields Harman said he would take him home if I would go home, and Peel seemed to want me to go home then and seemed to be real sorry that he had treated me like he had.    In the meantime he had sent my brother and

this Rob Harman after my sister.    I had sent her away before that; I had sent her home and sent her to Tug to my mother's; sent them to Tug to my mother's after my sister again.    Well; Shields said he would go home with him, and I said: 'Shields, will you stay all night, I am afraid to go.'    They said: 'Your baby is awfully sick,' and said if you don't go to him; Reuben said: 'If you don't go home you will never see your baby alive again.'    I said: 'I will go home.'    Shields promised to stay all night and when he drove in home he walked around the house and looked around and didn't say much of anything, but turned away and left.    Peel later come in in the night and said he had got some liquor from Will Hufford who lived down near the station then and Peel was awfully drunk again.    He hadn't been in the house but a few minutes until he raised trouble with me again and said he had sent for him a housekeeper and he didn't need me.    So I grabbed my baby that time, Pearlie Mae, and I got out.    It was raining and I stood— I went down to W. T. Harman's and stood out in his apple orchard under an apple tree to try to shelter out of the rain until I had seen Peel come down there with a lantern and he went all through W. T. Harman's place with his lantern, and after he went in the house of course I couldn't see him.    He went across the creek to Aunt Mary Crockett's house.    I saw him fall down as he went up the path and he carried this lantern around, and then in possibly thirty minutes he come on out and went on up back towards home.    After that I went across to Aunt Mary Crockett's and stayed all the rest of the night with my little baby.

\*      \*      \*      \*      \*      \*      \*      \*

"Q.  State whether or not you left the home of Peel Harman on Cavatt's creek at any other time, and if so,

under what circumstances you left there and where you went?

"A. Well; it was a few nights after this. Peel was drunk; him and Squire Gillespie come in home together and he come in and when we sat down to the supper table he got wrong because I waited on some one at the table before I waited on him, and he got up to hunt his jug of liquor and he seemed to have lost it, he couldn't find it, and he got to cursing and said I had hid his liquor and I would get it or he would kill me, and I was so excited I didn't know what to do. I tried to hunt his liquor for him but I couldn't find it, and then he carries his gun around through the house and said if I didn't get the liquor he would kill me, and I slipped out the back way with my baby and grabbed a blanket off of a bed we had in the kitchen, as I went, and I went to Jess Monday's that night, about a half a mile above us. I suppose that was about eleven o'clock in the night. I spent the night there.

\*     \*     \*     \*     \*     \*     .     \*     \*     \*

"A. I come on back with Peel and he was pretty good, pretty nice along until Hallett had typhoid fever, and I can't tell what time in the year Hallett had fever, about June, 1918, and he had a relapse of typhoid and was almost dead, and we had a nurse helping to wait on him. I had nursed him until I was worn out, and while the nurse was waiting on him I come to the drug store to get medicine for him and to get some groceries, and when I went back Peel was drunk and had been—I found he had been raising trouble in the home and jumped on Pearlie Mae and beat her and had her hollowing and screaming, and I told her to be quiet, not to say a word to Peel, after he woke up he would be all right. He was lying down at the time. So it wasn't but a few minutes until he got up and he seemed to have

forgotten that he had eaten his dinner and jumped on Pearlie again, and she run up the stair case to where me and Mrs. Newberry—that was the nurse—was to protect her. Dovie, Ellen Groseclose, myself and Mrs. Newberry was in the room, and he come in the room just knocking first one and another. I think the first one he struck was Mrs. Groseclose, then he struck at Dovie, and I don't know that he hit Dovie at this time. He told them to get out of there and they all scattered and got out but me and Mrs. Newberry. He started like he was going to draw a gun on me, but I didn't see the gun; he just put his hand in his pocket and asked me where I had been and I told him, and I got to hollowing, it excited me so, and this brought Hallett, seemed to bring him to his mind and he tried to get out of bed, and we had to run to hold him in, so Peel let up for a few minutes, but he was rough all night. We had an awful time with him to get him to try to be quiet so the patient could rest, and I told him if he would let me alone and God would forgive me until Hallett got able for me to leave home, I would go then, but to let me stay that night, and he said well, I could stay that night, and he said to be damned sure I went when Hallett got able; so when Hallett got able, sitting up in the room, why Peel reminded me that I hadn't been very prompt with my promise. He was drinking again and I asked him what he referred to, and he said I had promised to go away and leave him alone. Well; I was not bothering Peel, and I did, I went again.

"Q. Was that the last time you left home?

"A. No, sir.

"Q. The time you have just detailed, as I understand, was during the illness of your son, Hallett Harman, in 1918. You then left and went to Ellen Groseclose's home first and from there to C. A. Mitchell's in Bluefield. Did you then return home?

"A. I didn't at that time.  I stayed I think for about three weeks with Mrs. Mitchell and helped her with her house work and stayed with her.  Later I got me some rooms on Bluefield avenue, and went to trying to keep house.

*     *     *     *     *     *     *     *     *

"Q. Did you later return to your husband's home in Tazewell county?

"A. Well; I did once after that.

"Q. When did you return after that?

"A. I kept house at Bluefield then, but Peel come down there and lived with us some.  He was selling books and he lived with us for possibly four or five months, off and on, but he wasn't there regular, and he had let Pearlie Mae and Forest come down to go to school, and said when school was out he wanted me to come back home, and after he insisted on me coming back he said he would not drink any more liquor.  He said he knew he had mistreated us and he wanted to gather his family up together again and he said he would not drink any more liquor, so I agreed to come home, and he brought a little Ford car down; said he would go up home and have some cleaning up done and he would come after me, which he did, and I went home with him with the intention—he said he would deed me a piece of land if I would come home and live with him. I told him I didn't care for the land, but I wished he would treat me right and let me stay at home.  He said he would.  We had been home—I was going to move from there what little furniture I had and come back home when school was out, but we hadn't been at home but two days and nights when a jug of liquor showed up from somewhere and they was all drunk again and he shot Hallett with a shotgun.  He drawed this shotgun on me and begin to curse and abuse me, which I was not

taking any sides with Hallett, just begging and pleading for him not to kill him, and when he done that way I come out of 'Shotgun Hollow.'

"Q. Well; when was it that you come out of 'Shotgun Hollow?'

"A. That was in the spring, as well as I remember, it was in the month of April, 1919.

"Q. Where did you go then?

"A. I went to Bluefield, back to my home. Charley Harman come up to town, called up C. A. Mitchell and had him to come up here and get Hallett and take him to a hospital in Bluefield. We took him to the hospital, St. Luke's, and then we went on back home. I never come back to Tazewell to live with Peel after that, though Peel was at my house after that.

"Q. You say that during the time you lived on Bluefield avenue in Bluefield, West Virginia, that during a period of some four or five months, Peel Harman, your husband, would come off and on and live with you?

"A. Yes, sir.

"Q. You also just stated that after your return to Bluefield, that is after your son, Hallett, was taken to St. Luke's hospital in Bluefield, that your husband continued to come to Bluefield and live with you?

"A. Yes, sir; he did.

"Q. How late did he visit and live with you in Bluefield?

"A. Well; I can't say exactly how late it was. He stayed there until he got drunk and he raised trouble at home over this same thing I told you a while ago, and he worried me and abused me over the same thing because I would not yield to his desires, and he treated me so rough I had to put him out of my house that time. It was my house that time; I put him out. He went

down to Mitchell's coal yard and spent the night with C. A. Mitchell and Mrs. Gillespie.

"Q. This was as late as the spring of 1919?

"A. Yes, sir; it was the spring of 1919.

"Q. It was after Hallett had been taken to St. Luke's hospital in Bluefield?

"A. Yes, sir.

"Q. Mrs. Harman, you have stated that your husband offered to make you a deed for a part of his real estate?

"A. Yes, sir; he did.  Mr. Royall, I want to speak to you about these dates.  I am giving them just the nearest I can.  Don't pretend to say the day of the month or anything like that, but the dates of the year.

"Q. It appears from the deposition of C. E. Harman, taken on behalf of the defendants, that he filed a deed about which he testified, which appears to have been in the handwriting of Peel Harman, and which he stated was in the handwriting of Peel Harman, bearing date the 28th day of January, 1919. · In order to refresh your memory as to the last time you and your husband lived together in Bluefield, as detailed in your last answer, I will ask you if it was after the date of this deed?

"A. I am afraid I don't understand that question.

(Mr. Royall explains question to witness.)

"A. Yes, sir.

"Q. I here hand you the deed which C. E. Harman filed with his deposition in this case and will ask you to examine it and state in whose handwriting that deed is written?

"A. I would say it was Peel's.

"Q. Peel Harman's?

"A. Yes, sir; I don't think there is any doubt about that.

"Q. You have stated that at the time your son Hallett

Harman was ill with typhoid fever at the home of your husband and yourself of Cavatt's creek in this county, that Peel Harman was abusive and mistreated Dovie Harman, now Dovie Day, and Pearlie Mae Harman, now Pearlie Mae Powers?

"A. And Ellen Groseclose.

"Q. I was only referring to your children?

"A. Well; he struck her.

"Q. State at that time about how old Pearlie Mae was, and how old Dovie was?

"A. Pearlie Mae was about thirteen years old, and Dovie, I don't know exactly. She was about eighteen, eighteen or nineteen.

"Q. Did these girls give your husband any cause to mistreat them?

"A. None whatever. There isn't anybody could have sweeter girls than I have, if I have to say it myself. I have seen him many times knock Dovie down on her crutches and abuse and beat her awfully hard. I have seen him beat her almost to death.

"Q. You state that your daughter, Dovie Day, goes on crutches. In what way is she afflicted?

"A. She had tuberculosis of the bone when she was about ten years old and we had to have her limb amputated; since that time she has walked on crutches.

"Q. State what limb was amputated?

"A. A lower limb; a leg.

"Q. State the general disposition of Peel Harman and his conduct towards you and his children when he was under the influence of whiskey?

"A. I have seen Peel, when he was not drinking, tie the boys up, then they were fifteen and sixteen years old, to a tree in the back yard and whip them with a horse whip until he cut big, great big, gashes in them, and then afterwards have to grease them and doctor

them.   I have known him to beat Forest until his face was black all over as you might say, and kick him and abuse him.   I have known him to strip Charley Harman naked and whip him with a horse whip, but he would always nearly take him off out of my sight to whip him, but I have a few times seen that myself.   He was brutal in his treatment towards his children.   On the other hand, when Peel Harman wanted to be a good man he was as good as anybody could be; he was on the extreme when he was good; when he was good he was most too good to anybody; but these extremes one followed the other.   *   *   ''

Of the depositions of Mrs. Day, Mrs. Powers, Mrs. Groseclose, Mrs. Joana Harman and Samuel Jones, it must suffice to say that they corroborated the testimony of the plaintiff in all of the most material particulars.

The testimony of the witnesses for the plaintiff on the subject of the general reputation of the husband was to the effect that the general reputation of the husband was as aforesaid, that "when under the influence of liquor, he was quarrelsome, disorderly and dangerous man."

The defendants introduced no evidence whatever to rebut the said testimony of and in behalf of the plaintiff, except that the further deposition of the said C. E. Harman was taken in January, 1923.   In that deposition he testified, in substance, that he saw the plaintiff on the road after the occasion in April, 1919, on which she had finally left the home of her husband (being the occasion when the husband and son, Hallett, were both drunk and the husband shot the son and drew the gun on the wife and cursed and abused her; whereupon the wife "come out of 'Shotgun Hollow,' '' as she expressed it in her testimony), and that she was drunk and could

give no coherent explanation to him of what had occurred on such occasion, except that she "bawled Peel," (the husband) "out in general."

It should be mentioned that there were also issues in the case as to whether or not the plaintiff, after leaving her husband on the occasion last above mentioned, thereafter lived in adultery, and whether, if so, the husband was afterwards reconciled to her and suffered her to live with him; and that the evidence for the said two sons, who deny the right of the plaintiff to dower, and the evidence for the plaintiff on these subjects was in direct conflict, and that the court below, in the decree under review, held that after the leaving of her husband, just mentioned, the plaintiff "thereafter lived in adultery" and that the husband "was never reconciled to her."

*J. Powell Royall*, for the appellant.

*T. C. Bowen*, for the appellees.

SIMS, P., after making the foregoing statement, delivered the following opinion of the court:

[1] The defendants, who deny the dower right of the plaintiff sought to be enforced by the bill in this cause, rely upon the statute (section 5123 of the Code), as applicable to the evidence in the cause, to support the decree under review.    That statute is as follows:

*"Dower barred by. adultery of wife.*—If a wife, of he own free will, leave her husband and live in adultery, she shall be barred of her dower, unless her husband be afterwards reconciled to her, and suffer her to live with him."

Our view of the proper construction of this statute is that, before a widow can be barred of her dower in her

husband's estate thereunder, it must be proven, (a) that the wife of her own free will, *i. e.*, voluntarily, deserted her husband, and (b) that afterwards, when requested by him so to do, she refused to return to him, without just cause for such refusal.

This statute, while somewhat different in its precise phraseology, is held, by all of the authorities on the subject, to be the same in meaning as the English statute, Westm. 11, 13 Edw. 1, chapter 34; and such authorities are uniform in the holding that the construction thereof just stated is the proper and correct construction. *Reel v. Elder*, 62 Penn. St. 316, 1 Am. Rep. 414; *Shaffer v. Richardson's Adm'r*, 27 Ind. 122; *Cogswell v. Tibbetts*, 3 N. H. 41; *Bell v. Nealy*, 1 Bailey (S. C.) 312, 19 Am. Dec. 686.  And it is also uniformly held that voluntary separation or departure of the wife from the husband and voluntary remaining away from him thereafter, "as well as adultery, is necessary to make the bar (of the statute) complete." *Reel v. Elder, supra.*

That such is the proper construction of the statute is not only not controverted in argument before us, but is concurred in by counsel on both sides of the case.

[2] It follows from this that the mere facts that the wife leaves the home and that her husband remains there do not make the statute applicable.  If the leaving of the home by the wife is caused by such conduct on the part of the husband that the husband is guilty of constructive desertion of the wife—certainly where such constructive desertion consists of actual, physical, cruelty on the part of the husband, in such a degree as to cause the wife to leave and justify her in leaving the home to protect herself therefrom—it is not a voluntary leaving—it is not a leaving of the husband "of her own free will" within the meaning of the statute.

[3] It is true, however, that, although the leaving of

the husband by the wife may have been caused by the cruelty of the husband, yet, if afterwards he requests his wife to return, and at the time of such request, or requests, reasonable ground for fear on the part of the wife of recurring cruelty to her on the part of the husband, if she should return to the home and again live with him there in the marriage relationship, no longer exists, and she, for some other cause, which would not have been a legal excuse for her original leaving, refuses to return, the statute is applicable. In such case, the wife voluntarily refuses to return to the home after all legal ground for the separation on her part is at an end; which, in law, constitutes desertion on her part, as of the time of such voluntary refusal to return and resume the marital relationship. *Bell* v. *Nealy, supra*; 1 Bailey (S. C.) 312, 19 Am. Dec. 686; 1 Minor on Real Prop., sec. 306.

In *Bell* v. *Nealy, supra*, the original leaving of the husband by the wife was caused by his cruelty; but the refusal of the wife afterwards to return to him, when he requested her so to do, was not from any fear on her part that he would continue to be cruel to her if she did so, but for the sole reason, as she stated, when he frequently solicited her to return and live with him, "* * that she never liked him." The presiding trial judge, in such case, held that "it was clear, on authority, that although her departure had been compulsory, if she *voluntarily* remain with her adulterer, when the husband is willing to take her back, she is barred by the statute;" and on this ground applied the statute in bar of the wife's right of dower. The appellate court affirmed the case, saying: "The court concurs with the presiding judge, for the reasons he has given on all the questions he has discussed."

Such being the law, we have no occasion to consider

whether or not the court below erred in the holdings of
fact that the plaintiff, after her final leaving of the home
of the husband, "thereafter lived in adultery," and that
the husband "was never reconciled to her." Since the
voluntary separation in the first instance and the vol-
untary continuance of the separation thereafter on the
part of the wife, as well as the living in adultery, are
necessary to complete the bar of dower under the stat-
ute, we need consider only whether the preponderance
of the evidence sustains the decree under review upon
the issues presented by the following question, namely:

1. Did the wife, of her own free will, desert the hus-
band, and afterwards, when requested by him so to do,
refuse to return to him, without just cause for such re-
fusal?

We are of opinion that the preponderance of the evi-
dence in the cause does not sustain an affirmative an-
swer to this question. On the contrary, we are of the
opinion that the preponderance of the evidence clearly
answers such question in the negative.

[4] The testimony of the plaintiff on these issues of
fact is circumstantial, positive, consistent, clear and
convincing in its character. And she is expressly cor-
roborated by five other witnesses, with respect to the
most material circumstances which tend to show that
she was forced, as she testified she was, to finally and
permanently leave the home of her husband by his cru-
elty to her on his frequently recurring drunken sprees,
culminating in the extreme cruelty of conduct on the
occasion of her final departure from the home, to which
she testified; and that she afterwards refused to return
to the home because of the fear that she would be sub-
jected to the repetition of cruelty of treatment by the
husband if she did return; and that such fear was a rea-
sonable fear under the circumstances. The testimony

is indeed uncontroverted to the effect that the drunken sprees of the husband were very frequent and continued during the whole period after his marriage until his death; that when the husband was on his drunken sprees he was a quarrelsome, disorderly and dangerous man; and that his repeated and great cruelty to his wife while on such sprees finally caused her to leave his home and to thereafter remain away to shield herself from bodily harm from him which she reasonably apprehended.

There is really nothing in the testimony of and for the two defendants, who endeavor to maintain the affirmative of the question under consideration, when the manifestly disingenuous character of that testimony is considered, to controvert the fact that when on his drunken sprees the husband was guilty of the numerous acts of cruelty, which the wife testified finally forced her to permanently leave the home of her husband, or to controvert the truth of her testimony to the effect that she had reasonable ground to fear that she would be cruelly treated by her husband if she returned to him, as he requested, and that she, for that reason alone, refused to afterwards return to him. None of the testimony of and for such defendants even attempts to controvert the testimony of and for the plaintiff on the subject of what was the conduct of the husband towards the wife prior to her final leaving of his home, or what might reasonably have been expected would have been his conduct towards her had she afterwards complied with his request for her return to his home, and had she attempted to again live with him there in the marriage relationship, *when the husband was on his drunken sprees.* The testimony of and for the two defendants mentioned carefully avoids dealing in any detail with the times of such drunken sprees; except that, for example, Robert

F. Harman, in answer to the general question as to whether, while the husband and wife lived together, the husband "was affectionate," says that "he was a little disagreeable when he was drinking." He does not explain what he considered "a little disagreeable;" nor does he, or any witness for these defendants, testify on the subject of what was the conduct of the husband towards the wife when he was drunk. Indeed, the very character of the answers of these witnesses on the subject of the conduct of the husband towards the wife shows that they do not undertake to deny that he was cruel to her when drunk. To illustrate: C. E. Harman had abundant opportunity to know that the explanations given by the plaintiff in her testimony of the cause of her leaving the home, as she testified, were untrue, if they were untrue, and he confines his testimony on this subject to the bare statement of the undisputed facts that she left the home "several times;" that the husband would go after her (sic., when he got sober, but the witness is not frank enough to say so); and that she was away a considerable time on some of these occasions; and he says not a word to negative the fact that she was driven away at those very times by the extreme cruelty of the husband when drunk. He says that the husband was affectionate towards, and almost worshipped his wife; which is not disputed—having reference to the times when he was sober; and says not one word of the attitude of the husband towards the wife when he was not sober! And his answer to the following question, on his examination in chief, illustrates the character of the testimony of this witness:

"Q. Please state, on the various occasions during the last ten years that Peel Harman and his wife lived together, when she would leave home at periods and remain away from home, and when later Peel would go

for her and she would return home, she ever stated any reasonable cause for leaving or not, or about what explanation would she give for her conduct?

"A. Well, now; I don't know whether I could say that I know that."

Such an answer, from this witness, acquainted as he must have been with the facts, is, by its very silence, convincing in its confirmation of the truth of the testimony of the wife. Further: The testimony of the plaintiff and of her chief witnesses was so circumstantial that it would have been easy to have produced witnesses to contradict their statements of fact, if untrue. And, yet, after the testimony of and for the plaintiff was taken, no deposition of a single witness was taken in behalf of the defendants even attempting to contradict the aforesaid testimony of and for the plaintiff.

Moreover, in one of the two letters of the husband, written on May 21, 1919, shortly after the final departure of the wife from his home on the occasion of the shooting of the son Hallett, etc., we find unmistakable confirmation by the husband himself of the wife's testimony to the effect that that departure was due to the cruelty of the husband's conduct towards her which culminated on that occasion. In that letter he says this: "* * I had been in good hopes of us getting along all right until Hallett come and raised his row. Well; he is sorry about it, just as sorry as I am about our trouble. * * I do not feel that I mistreated you, but, nevertheless, if you feel that way, I ask your forgiveness for any and all wrongs that I have done you. * * " Why mention mistreatment, if it had no existence, except in the wife's statement, or wrongs to the wife if no wrong was done her? It is evident from this that the husband was informed as soon as he sobered up what his wife then claimed, *ante motem litem,* was his conduct on the oc-

casion of her finally leaving the home—that being the same conduct to which the wife has testified in this case. Such evidence, from its very nature, is of the most convincing character. That he did not feel that he had mistreated his wife is easily explained by the fact that he naturally lacked recollection of his conduct while drunk.

And the other of the two letters just mentioned also tends strongly to corroborate the testimony of the plaintiff, in that it shows that a degree of estrangement existed between the husband and wife following her final departure from the home, which is to be accounted for only by the inference that the wife's testimony concerning the cause of that departure is true.

[5] That many of the acts of cruelty of the husband occurred a long time before the final departure of the wife, and that the wife returned and cohabited with the husband after all of them, except those which were inflicted upon her at the time of her final departure from the home, does not render the evidence of such repeated conduct any the less cogent in establishing the fact that such last departure of the wife from the home was not of her own free will.

[6] In *Owens* v. *Owens*, 96 Va. 191, at p. 195, 31 S. E. 72, 74, this is said: "Cruelty * * is cumulative, admitting of degrees and augmenting by addition; so that it may be condoned and even forgiven for a time, and up to a certain point, without any bar in sense or reason to bring it forward when the continuance of it has rendered it no longer condonable. While, therefore, acts of violence committed at an earlier period, and which have not prevented the wife from living with her husband, or going back to him after they have been separated, cannot be made the sole foundation of an action of separation, they form the subject of investiga-

HARMAN *v.* HARMAN, 139 VA. 508.

tion and proof, with a view to determine what is the true issue in the case, namely, whether the wife can, with safety to her person and health, continue to live with him. 2 Bishop on Marriage and Divorce, section 304.

"Cruelty consists of successive acts of ill treatment, if not of personal injury; so that something of condonement of earlier ill treatment must in such cases necessarily take place. Section 305." See also *Elder* v. *Elder, ante,* p. 19, 123 S. E. 369.

The decree under review will be reversed, and the cause will be remanded for further proceedings, not in conflict with the views expressed in this opinion.

*Reversed and remanded.*