### Richmond

## G. DALE PIGG

### v.

## EVA F. HALEY, ET AL.

September 9, 1982.

Record No. 800529.

Present: All the Justices.

*N. Carr Stogner, Jr. (John McNally; Murphy, McGettigan, McNally & West, P.C.,* on briefs), for appellant.
*Edward S. Graves (Reginald H. Pettus; Edmunds, Williams, Robertson, Sackett, Baldwin & Graves,* on brief), for appellees.

COMPTON, J., delivered the opinion of the Court.

The focus of this appeal is upon the validity of an agreement, executed to settle uncertainties arising from the doubtful meaning of provisions in a will.

Edward F. Haley, a resident of Charlotte County, died testate on July 13, 1977, survived by his wife, appellee Eva F. Haley. The testator's one-page holograph, duly probated shortly after his death, provides in part:

> "Third: Whatever, land I may own, ~~or interest in land~~ including buildings, furniture farming equipment of all kinds, livestock of every description, automobiles, money in hand, or in banks, or owing to me, shall immediately upon my decease become the property of my wife, Eva F. Haley, to be used for her decent support during her natural life.

"Fourth: It is my will and desire that upon the death of my said wife whatever residue of my estate either real or personal which she has not consumed or disposed of shall become the property of Garland D. Pigg."

Appellant Pigg, a resident of Fairfax County, was a distant cousin of the testator.

At his death, Haley owned certain personal property and an undivided one-half interest in approximately 152 acres of land in Charlotte County; his wife owned the remaining one-half interest in the realty.

Because of doubt as to the meaning of the foregoing language in the will, the agreement in dispute was executed about two weeks after Haley's death by the widow and Pigg. Drafted by an attorney, the operative portions of the agreement provide:

"1. That all personal property, both tangible and intangible, in the Estate of Edward F. Haley, shall be the sole and exclusive property of Eva F. Haley, with complete right to dispose of the same in any manner that she might deem fit, and the party of the second part relinquishes any interest that he might acquire under the will of Edward F. Haley, in this regard.

"2. That the interest in any real estate that Edward F. Haley died seized and possessed of in Charlotte County, Virginia, shall be construed as to give his wife, Eva F. Haley, a life estate therein exclusively, with the remainder over to Garland D. Pigg, upon her death, in fee simple and absolutely."

Subsequently, the widow and appellees Donald F. Haley and Betty R. Haley, his wife, executed a real estate contract in May of 1979 for the sale by the widow to the Haleys of 30 acres from the 152-acre tract. Within a month, the present suit was filed by the widow and the Haleys against Pigg. By virtue of the contract, the Haleys claim "an equitable fee interest" in the 30 acres.

Alleging that the testator devised his one-half interest in the 152-acre tract to his widow to be "held by her in fee simple during her life with an absolute power of disposition and consumption," the plaintiffs asserted in their bill in equity that Pigg "claims title to [the 30-acre parcel] adverse to plaintiffs." The plaintiffs further alleged that the 1977 agreement constitutes a

cloud on both the legal and equitable title to the 30 acres. Asserting the agreement is unenforceable, the plaintiffs sought judgment quieting title in their favor, a declaration that the agreement is null and void, and an adjudication that Pigg has "no right, title, or interest in or to said property."

Following an October 1979 ore tenus hearing, the trial judge ruled from the bench in favor of the plaintiffs, declaring the agreement void. The court found the agreement lacked adequate consideration. In the January 1980 final decree, from which we awarded Pigg an appeal, the court decided that the effect of the will "was to vest in [the widow] the right to consume and dispose of, by sale, gift, or otherwise, the property of" the testator. Thus, the court implicitly held that Pigg received nothing under the will which he could relinquish in the agreement.

Upon appeal, as in the court below, the validity of the agreement depends upon the interpretation of the will. Our analysis, of necessity, will be in two steps. Initially, we must interpret the will. Because the words of the will are of doubtful meaning and the uncertainty is not resolved by reading the will as a whole, we will consider admissible extrinsic evidence to establish the relevant facts and circumstances that surrounded the testator at the time the will was executed. *Salley* v. *Burns,* 220 Va. 123, 128, 255 S.E.2d 512, 514 (1979). Next, we must address the issue of consideration and, in so doing, we will consider all the relevant circumstances disclosed by the record.

The pertinent facts are mostly undisputed. The widow presented all of the testimony for her side of the case. Pigg called as witnesses the attorney who prepared the agreement, a tax adviser of the testator, Pigg, and his wife.

The decedent and his wife married in 1937. He taught in an Alabama high school for a period of time and, because he was a native of Virginia, the couple moved to Charlotte County where both husband and wife worked. He farmed, taught, and sold life insurance; she was a registered nurse. During the 1940s, with their joint funds, the couple purchased the 152-acre "farm" in question, deeded to them "jointly" and without "a survivorship clause," and later built a residence on the property. They worked on the farm together, and actually participated in the construction of their home.

As a hobby, the decedent engaged in genealogical research. During the 1940s, when he was teaching at Hargrave Military

Academy, the decedent "discovered" Pigg, a fourth cousin, while searching records in Chatham. Pigg, about seven or eight years old at the time, lived near Chatham with his parents. Thereafter, a close personal relationship developed between the decedent, who had no children, and Pigg, whose father died when he was a young person. Calling the decedent "Uncle Frank," young Pigg regularly visited the decedent and his wife on their farm, staying for periods of time during the summer months.

After Pigg completed high school, the decedent helped Pigg during the 1950s obtain entry to Ferrum College, the decedent's alma mater, and "arranged" for Pigg to have a scholarship there. Later, Pigg lived with the decedent and his wife while he attended one semester at Longwood College, where Mrs. Haley was employed as a nurse.

After finishing college, Pigg taught for a period of time at Staunton Military Academy. He married in 1962. Subsequently, Pigg, his wife, who was also a teacher, and their children spent a part of all the regular holidays—Thanksgiving, Christmas, Easter, and the summer—with the Haleys. The Piggs had possession of a key to the Haleys' home so they could enter if no one was there when they arrived for a visit. When asked to describe the relationship existing between her husband and Pigg in 1964, when the will in question was written, the widow testified they were "friends" and "[r]easonably close." Pigg stated he and Haley had a "close" relationship.

After 1964, the decedent advanced Pigg $10,000 to purchase a 130-acre tract adjacent to the property in question. The loan subsequently was repaid. According to the evidence, the regular visits and the personal relationship between the Piggs and the Haleys continued into the 1970s and past 1972 when Mrs. Haley retired from her employment at Longwood College.

During the decedent's final illness, while he was hospitalized in Farmville, the Piggs came from their home in Fairfax, having been called by Mrs. Haley. When Haley died, the Piggs assisted with the funeral arrangements.

Within a week of the death, an unwitnessed typewritten will dated in 1963 was found in Haley's desk at home. When the widow was advised the writing could not be admitted to probate, a further search among Haley's effects was made with the assistance of the Piggs. Finally, Mrs. Pigg discovered the will in question among Haley's voluminous genealogical notes.

On the day the will was probated, Lelia Hoy, a Charlotte County attorney who had reviewed the will, told the widow she had only a life interest in her husband's estate, observing: "You own nothing; you have the use of the property, the use of the farm; the proceeds of the farm until you die; and you have the interest from the money until you die."

The widow testified that this news was "overwhelming" because she had no knowledge of a will; in fact, Haley told his wife during his last illness "that he had no will." The widow testified she felt she had been "sabotaged" because in 1964, when the will was written, the couple "did not have any money;" they had recently finished making large, regular payments over a ten-year period on a joint annuity.*

The widow, accompanied by the Piggs, then went to Farmville to consult R. A. Wilmouth, the proprietor of "a bookkeeping tax service." Wilmouth had prepared income tax returns for the testator for a number of years. In discussing the tax aspects of the estate, he said to the widow: " 'You will receive the interest from the money, and you will have the proceeds from the farm.' " Upon Wilmouth's recommendation, the widow, still accompanied by the Piggs, then consulted E. Preston Lancaster, Jr., a Farmville attorney.

Lancaster, noting the ambiguity in the will, mentioned that a court interpretation should be sought. But "the main thing on [the widow's] mind," according to Pigg, was that an agreement be prepared to fix the interests of the respective parties.

According to Pigg, the widow stated to him repeatedly, after realizing that the meaning of the will was uncertain: " 'Uncle Frank and I always wanted you to have the farm, and we didn't intend for you to have the money.' " The widow testified that she suggested the agreement in an effort to "salvage some property for myself." When asked whether the testator before his death mentioned "the possibility of leaving an interest in the farm" to Pigg, the widow said: "I did not recall that he said that." The widow previously had stated in a deposition in responding to a similar question: " 'Well, he might have mentioned it vaguely.' "

---

* At the hearing, however, the widow testified, in response to a question by the chancellor, that "the value of the personal property" in the estate was "[a]bout a hundred thousand . . . dollars." The record shows the Inventory of the decedent's estate listed personal property valued at $22,950. The 152-acre tract was appraised at $96,000.

The record shows that the widow suggested the terms of the agreement to Lancaster who, on the date it was executed, dictated the language of the document to his secretary in the presence of the widow and the Piggs. According to Lancaster, the widow said to him that the agreement reflected "what her husband would have wanted." At the time the agreement was executed, Lancaster asked both parties whether they understood the document and whether "these were the terms that [they] wanted"; the widow responded "yes" and Pigg said: " 'If that's what she wants, that's okay with me.' "

Even though the agreement recites "in consideration of the sum of TEN DOLLARS ($10.00), and other good and valuable consideration, the receipt of which is hereby acknowledged, and the love and affection that exists between the parties," no money actually passed between the parties.

Before construing the will, Code § 55-11, the doctrine of *May* v. *Joynes,* 61 Va. (20 Gratt.) 692 (1857), and Code § 55-7 should be reviewed. Code § 55-11 provides:

> "When any real estate is conveyed, devised or granted to any person without any words of limitation such devise, conveyance or grant shall be construed to pass the fee simple or other whole estate or interest which the testator or grantor has power to dispose of in such real estate, unless a contrary intention shall appear by the will, conveyance or grant."

Under *May* v. *Joynes,* "where a life estate is given to the first taker coupled with the absolute power of disposition, the added power raises the life estate to a fee in real property and absolute ownership of personalty, and any limitations in the remainder over are void for repugnancy and uncertainty." *Rawlings* v. *Briscoe,* 214 Va. 44, 45, 197 S.E.2d 211, 212 (1973). But the foregoing rule has been modified by statute.

Code § 55-7 provides, in part:

> "A. If any interest in or claim to real estate or personal property be disposed of by deed or will for life, with a limitation in remainder over, and in the same instrument there be conferred expressly or by implication a power upon the life tenant in his lifetime or by will to dispose absolutely of such property, the limitation in remainder over shall not fail, or be

defeated, except to the extent that the life tenant shall have lawfully exercised such power of disposal."

The effect of the statute is to validate the gift over "where the first taker is given an *express estate for life,* coupled with the absolute power of disposition." *Mowery* v. *Coffman,* 185 Va. 491, 495, 39 S.E.2d 285, 287 (1946). *Accord, Borum* v. *National Valley Bank of Staunton,* 195 Va. 899, 910, 80 S.E.2d 594, 600 (1954).

In order for the statute to apply, the following requirements must be met: (1) The first taker must be given an express estate " 'for life' "; (2) there must be " 'conferred expressly or by implication a power upon the life tenant in his life time or by will to dispose absolutely of said property' "; (3) there must be " 'a limitation in remainder over' "; and (4) there must be a corpus upon which the limitation in remainder over can operate. *Borum,* 195 Va. at 909, 80 S.E.2d at 599.

 It is against this background that the competing parties debate the meaning of the will. The widow says she acquired either an absolute fee simple interest, in which case § 55-7 would not apply, or she acquired "a life estate coupled with an absolute power of disposition during her life," in which case the savings provisions of § 55-7 would apply. But, the argument continues, under the latter alternative, the second taker must prove what property, if any, remains at the death of the first taker, and it is doubtful that Pigg will be able to prove at the widow's death that she did not dispose of all the testator's property. Thus, in either event, says the widow, Pigg received under the will nothing which he could surrender in the agreement.

Pigg contends that the will created an express life estate in the testator's property in Eva Haley, coupled with an absolute inter vivos power of disposition, and a remainder over to Pigg. He argues the widow took less than a fee simple interest in the realty and less than an absolute interest in the personalty. Consequently, Pigg urges, his interest acquired under the will was such as to constitute sufficient consideration for the agreement. We concur.

The extrinsic facts show the circumstances surrounding the testator in 1964 when he wrote the will. A strong bond existed between the Haleys who, at that time, had been married 27 years. They had labored together in operating their farm and in building their home, pooling their financial resources acquired from their

respective occupations. There was also a close, avuncular relationship between the testator and Pigg, a tie based on mutual respect and affection that, at the time, had existed for over 20 years. Consequently, the parol evidence established that the objects of the testator's affection were, principally, his wife and, secondarily, Pigg.

This situation is confirmed by an examination of the entire will. In the First and Second clauses, the testator recited that a nephew and a great niece each owed him "a sum of money." He provided that "whatsoever" sums were owing by them to him at his death be "cancelled and considered as paid." Then, following the paragraphs here in issue, he designated, in the Fifth and Sixth clauses, a burial place and his wife as executrix. Thus, Haley provided for his main beneficiaries in the disputed clauses, which disposed of the bulk of his estate; indeed, the only mention of Pigg in the entire will is in the Fourth clause.

Against this background, we turn to the language of the clauses in issue. The testator provided in the Third clause that whatever land he owned, "including" items of personal property, should immediately upon his decease "become the property" of his wife, "to be used for her decent support during her natural life." Then, he wrote in clause Fourth: "It is my will and desire that upon the death of my said wife whatever residue of my estate either real or personal which she has not consumed or disposed of shall become the property of Garland D. Pigg."

We conclude, contrary to the widow's contention, that the words "shall immediately upon my decease become the property of my wife . . . to be used for her decent support during her natural life," created an express life estate in the testator's property. In *Borum,* similar language was interpreted to create such an estate. There, the testator provided: " 'I will bequeath and devise all of my property, personal, real and mixed to my wife for and during her natural life.' " 195 Va. at 900, 80 S.E.2d at 595. Here, as there, we believe the language points to the intention of the testator to provide for the support and comfort of his wife during her life, but, upon her death, such of the property which she had not consumed would pass to Pigg, his esteemed kinsman. Such a plan, under these facts and circumstances, would benefit both objects of the testator's affection.

The question then becomes whether Code § 55-7 is applicable to clauses Third and Fourth. We think it is. An express life

estate was created, fulfilling the first requirement of the statute. The Fourth clause confers expressly a power upon the life tenant in her lifetime, as she agrees on brief, to dispose absolutely of the property, thus satisfying the second requirement. In addition, the language of the Fourth clause manifestly is a limitation in remainder over, thus fulfilling the third statutory requirement. Finally, there is a corpus; property remains undisposed of by the life tenant on which the "limitation in remainder over" can operate. *See Borum,* 195 Va. at 909, 80 S.E.2d at 599.

The cases relied on by the widow are all distinguishable on their facts. For example, in *Mowery,* the following language was determined to create a fee simple interest in the decedent's wife:

> " '6. I give, devise and bequeath to my beloved wife, Virginia V. Rickard all my real and personal estate of any and every kind of which I shall die seized and possessed except as above disposed of with full authority to dispose of any part thereof that she may deem necessary for her support and maintenance.
>
> " '7. I will and direct that after the death of my said wife, if she survives me, my Executor hereinafter appointed, shall sell all my real and personal estate then remaining in such manner and at such reasonable time thereafter as he shall think best. Out of the proceeds of said sales I hereby will and direct that my said Executor pay all debts and burial expenses of my said wife, and the residue thereof I give and bequeath to . . . .' " 185 Va. at 492-93, 39 S.E.2d at 286.

The court held that § 55-7 was not triggered because the remainder over was after a fee-simple estate, and not an express life estate. Additionally, the court held that the expressions by the testator of the uses to which the first taker may put the proceeds of the disposition of the property merely stated the motive for the gift and were not restrictions. 185 Va. at 494, 39 S.E. 2d at 286-87. In the present case, however, the language of the will is materially different, creating an express life estate. Moreover, the qualifying words, we think, detract from the gift to the first taker and are not words merely expressing a motive.

The widow also relies on *Rawlings,* in which the following provisions were interpreted:

" 'All the rest and residue of my property, real, personal, or mixed and wheresoever situated, of which I may die seized or possessed, or to which I may be entitled at the time of my death, I give, devise and bequeath unto my beloved mother, Willie Ell Chewning, for and during her natural lifetime, . . . In the event my said mother should survive me and be entitled to a life estate in the residue of my estate as aforesaid, I authorize and empower her to sell any or all of the said residue at her discretion and use any part of the principal thereof that may be necessary for her care and maintenance.' " 214 Va. at 44-45, 197 S.E.2d at 212.

Five days after the will was probated, the mother conveyed by deed of gift a tract of land, of which the testator died seized and possessed, to the testator's daughter. The question was whether the mother had the right and power to convey the property without monetary consideration. Affirming the trial court, we held the direction for disposition for "care and maintenance" merely expressed the motive for the gift and that the mother acquired a fee simple interest in the subject property. However in that case, unlike this one, this Court relied only on a reading of the will and on no extrinsic facts in construing the will; and the limiting language was different.

Accordingly, we hold that the gift over to Pigg constituted a valid gift under Code § 55-7, and that the doctrine of *May* v. *Joynes,* relied on by the widow, does not apply to create in her a fee simple interest in the realty and absolute ownership in the personalty.

■ And, as we have said, the interest Pigg acquired under the will affords the basis for adequate consideration in the agreement. In *Brewer* v. *First National Bank of Danville,* 202 Va. 807, 120 S.E.2d 273 (1961), we said:

"Consideration is, in effect, the price bargained for and paid for a promise. It may be in the form of a benefit to the party promising or a detriment to the party to whom the promise is made. It matters not to what extent the promisor is benefited or how little the promisee may give for the promise. A very slight advantage to the one party or a trifling inconvenience to the other is generally held sufficient to support the promise." 202 Va. at 815, 120 S.E.2d at 279.

Here, as we have pointed out, Pigg acquired a remainder interest under the will in the realty and personalty. In order to make certain that which the will rendered ambiguous and vague, the parties entered into this agreement, in which Pigg relinquished his interest in all of the decedent's personalty and acquired a "remainder . . . in fee simple" in the realty. While it is true, as the widow argues, that under our interpretation of the will eventually there may have been no property remaining undisposed of by the life tenant at the time of her death, nonetheless, Pigg in 1977 suffered a detriment by agreeing to surrender his interest in the personalty, at a time when the property had not been dissipated.

Finally, the widow argues the agreement is void because, as the trial judge found, there was a mutual mistake of fact. She contends that the parties entered into the agreement upon the mistaken assumption that she acquired under the will a life estate only, when "at a minimum" she was given "a life estate in her husband's property and, without any dispute, the unfettered right to dispose of it."

Generally, equity, while relieving mistakes of fact, will not give relief from a mistake of law, except in extraordinary cases. *Wilson v. Butt,* 168 Va. 259, 268, 190 S.E. 260, 264 (1937). *Accord, Piedmont Trust Bank v. Aetna Casualty and Surety Co.,* 210 Va. 396, 401, 171 S.E.2d 264, 267-68 (1969). *Cf., Criterion Ins. Co. v. Fulgham,* 219 Va. 294, 247 S.E.2d 404 (1978). But that rule has been confined to mistakes of the general rules of law, and does not apply to the mistakes made by individuals as to their own private legal rights and interests, such as to the ownership of property. Those private rights are treated as matters of fact, albeit the result of matters of law. *Burton v. Haden,* 108 Va. 51, 56-57, 60 S.E. 736, 738 (1908). However, the latter rule has no application to cases of compromise, when doubts have arisen as to the rights of parties, and they have intentionally entered into an agreement to compromise and settle those doubts. *Id.* at 58, 60 S.E. at 738. *Accord, Robinson v. Shepherd,* 137 Va. 687, 693-94, 120 S.E. 265, 267 (1923). This is such a case.

Manifestly, the record shows that the parties to the agreement both were in doubt as to their respective interests under the will, that they intentionally made a sincere effort to settle their respective claims, and that they endeavored to avoid the litigation suggested by Lancaster. Consequently, and the transaction being de-

void of overreaching or unfair dealing on either side, we will not annul the agreement on the ground of mutual mistake.

For the foregoing reasons, we conclude that the trial court erred in declaring the agreement of July 26, 1977 void and in removing the cloud on the title to the 30-acre tract. Accordingly, we will declare such agreement valid and enforceable, reverse the judgment appealed from, and enter final judgment dismissing the bill of complaint.

*Reversed and final judgment.*