COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:    Judges Beales, McCullough and O'Brien
Argued by teleconference


DEBORAH MacDOUGALL

v.      Record No. 1981-14-4

RICHARD S. LEVICK                                    OPINION BY
                                         JUDGE STEPHEN R. McCULLOUGH
RICHARD S. LEVICK                              FEBRUARY 23, 2016

v.      Record No. 1982-14-4

DEBORAH MacDOUGALL


UPON A REHEARING

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Randy I. Bellows, Judge

James Ray Cottrell (John K. Cottrell; Cottrell Fletcher Schinstock
Bartol & Cottrell, on briefs), for Deborah MacDougall.

Edna Ruth Vincent (Richard J. Colten; James A. Watson, II;
Colleen M. Haddow; Mary C. Huff; Colten Cummins Watson &
Vincent, P.C., on briefs), for Richard S. Levick.


We consider a number of issues in these consolidated appeals.[1]  Deborah MacDougall

challenges the trial court's rulings with regard to whether she contracted a valid marriage with

Richard S. Levick and the enforceability of the parties' marital agreement.  Levick challenges the

court's refusal to compel reimbursement of *pendente lite* support and attorneys' fees following its

_____

[1] To avoid piecemeal opinions on interrelated and consolidated cases, we vacate our prior
opinion and reissue this single consolidated opinion as the controlling opinion for both cases.

declaration that the marriage was void. Upon rehearing, and for the reasons noted below, we affirm the trial court.

## BACKGROUND

### I. THE PARTIES HOLD A MARRIAGE CEREMONY WITHOUT A MARRIAGE LICENSE

Levick and MacDougall decided to get married at "an extraordinarily busy time." They had just purchased a home, and the wedding planning occurred while they were busy packing their belongings in anticipation of the move. At the same time, they were still caring for two young children, and Levick was busy running his business. The couple set their wedding date for December 21, 2002. The wedding ceremony was to take place at their new home in McLean, Virginia. Neither Levick nor MacDougall thought about obtaining a marriage license because neither realized that they needed one.

Rabbi Binyamin Raviv Biber had never performed a wedding in Virginia. He registered with a Virginia circuit court so he could officiate on this occasion. On the wedding date, Rabbi Biber checked final preparations and noticed that there was no marriage license. This "was a surprise" to him because he had never performed a wedding "where the marriage license wasn't actually there." The rabbi and the parties decided to "deal with that later because" everyone was "ready to do the wedding." Rabbi Biber instructed the parties to deliver a marriage license for his signature, as soon as possible, once they obtained one. The ceremony went on as scheduled.

Approximately two weeks later, on January 6, 2003, the couple went to the Fairfax County courthouse and obtained a marriage license. That same day, Levick mailed it, via FedEx, to Rabbi Biber at his Maryland address. Rabbi Biber was traveling at the time but signed the marriage license upon his return on January 21, 2003. He listed the marriage date as January 21, 2003, the date he signed it. He listed McLean, Virginia, as the place of marriage. Neither Levick nor MacDougall was present when Rabbi Biber signed the marriage license, and Rabbi Biber performed

no other ceremony for the couple.  Over the years that followed, both parties assumed that they were husband and wife.

## II.  THE PARTIES LITIGATE DIVORCE AND ANNULMENT

MacDougall filed for divorce on March 21, 2011.  She attached to her divorce complaint a marital agreement dated July 20, 2009.  This marital agreement stated that it "shall form the foundation of a divorce or separation agreement, should either come to pass" and, among other clauses, stipulated that Levick would pay MacDougall annual spousal support of $150,000.  MacDougall sought an award of *pendente lite* support in accord with this agreement.  On September 16 and November 2, 2011, the court ordered *pendente lite* support for MacDougall in the amount of $8,000 per month.

Following protracted litigation over the validity of the marital agreement, the court ruled, on August 27, 2012, that Levick had made a knowing, explicit, voluntary, and valid waiver of his right to contest the marital agreement.  The trial court relied on counsel's statements at a hearing on February 17, 2012, that Levick was withdrawing his challenges to the agreement and that he would "live with the agreement, as must Ms. MacDougall."  The court vacated the prior *pendente lite* support orders and entered a new order incorporating the marital agreement.  This order required Levick to pay monthly support of $12,500 ($150,000 annually).

On February 27, 2013, the litigation took a sharp turn when Levick filed a petition for declaration of marriage status.  He contended that the parties' failure to follow statutory prerequisites meant that they never lawfully married.  He argued that there was no marriage license when the rabbi performed the ceremony, and after the parties obtained a license, they did not solemnize a marriage.  He argued that the invalidity of the marriage required the court to set aside the marital agreement.  He moved for leave to amend his pleadings to reflect "newly discovered evidence of the nullity of the marriage."  Levick explained that he had always assumed that he was

- 3 -

lawfully married but began to investigate further when he and his attorneys noticed the discrepancy between the date that the marriage ceremony took place and the date that Rabbi Biber listed on the certificate. On March 15, 2013, over MacDougall's objection, the trial court granted Levick leave to amend. On April 12, 2013, Levick filed a motion to suspend support payments.

On August 23, 2013, the court granted MacDougall's motion for *pendente lite* attorneys' fees in the amount of $191,288.

On October 10, 2013, following an evidentiary hearing, the court entered an order holding that the marriage was void *ab initio* because the parties had not complied with the statutory requirements for contracting a lawful marriage in Virginia. The court declined to resolve at that time the other relief Levick sought.

In the wake of this ruling, on October 3, 2014, the court held that the marital agreement was invalid, predicated as it was on the parties' mistaken belief that they were married. The court held that Levick's earlier waiver did not foreclose his new challenge, explaining that, because Levick was not aware of the potential invalidity of the marriage on February 17, 2012, any waiver of the right to challenge the marital agreement on the absence of a marriage would not have been knowing and voluntary. The court suspended, effective November 21, 2013, any *pendente lite* support orders. The court declined to order MacDougall to reimburse Levick for past support payments, although it observed that it had the discretion to do so. Finally, on August 15, 2014, the court ordered Levick to pay additional attorneys' fees in the amount of $100,000 – rejecting MacDougall's request for $513,252. MacDougall received a total of $291,288 in attorneys' fees and $304,500 in support during the course of the litigation.

These consolidated appeals followed.

- 4 -

ANALYSIS

I. THE TRIAL COURT WAS WELL WITHIN ITS DISCRETION WHEN IT ALLOWED LEVICK TO AMEND HIS PLEADINGS TO CHALLENGE THE VALIDITY OF THE MARRIAGE.

MacDougall argues that Levick should not have been granted leave to amend to challenge the validity of the marriage. She notes that the amendment followed extensive and costly litigation. She also points out that, from the litigation's inception, Levick had full knowledge of the facts that gave rise to the claim on which his amendment was based. She argues that allowing Levick to amend, under those circumstances, did not serve the "ends of justice."

Rule 1:8 provides, in relevant part, that "[n]o amendments shall be made to any pleading after it is filed save by leave of court. Leave to amend shall be liberally granted in furtherance of the ends of justice." "Amendment serves the underlying policy of litigating the actual controversy between the parties, rather than the approximation of it that was initially pleaded." Kent Sinclair & Leigh B. Middleditch, Jr., Virginia Civil Procedure § 11.2[A], at 813 (6th ed. 2014). "[T]he decision to permit amendments of pleadings rests in the sound discretion of the trial court and will not be disturbed absent a showing of abuse of discretion." Adkins v. Dixon, 253 Va. 275, 279, 482 S.E.2d 797, 800 (1997).

We find no abuse of discretion. At the time Levick moved to amend, the litigation, while extensive, had not reached anything close to finality. There was no prejudice to MacDougall's ability to investigate and litigate the facts alleged in Levick's amended pleading. Moreover, "public policy forbids that a [party] should be barred from bringing a suit to declare null a marriage contract which never had any valid existence." Heflinger v. Heflinger, 136 Va. 289, 301, 118 S.E. 316, 320 (1923). With that threshold question resolved, we proceed to the merits of MacDougall's appeal.

II. APPLICABLE STATUTES AND LONGSTANDING CASE LAW POINT UNMISTAKABLY TO THE CONCLUSION THAT NO MARRIAGE IS CREATED WHEN THE PARTIES CELEBRATE A MARRIAGE WITHOUT A MARRIAGE LICENSE OR OBTAIN A LICENSE BUT DO NOT TIMELY CELEBRATE.

A. Historical background of our marriage statutes

"Marriage is very properly regarded as the foundation of human society." Toler v. Oakwood Smokeless Coal Corp., 173 Va. 425, 430, 4 S.E.2d 364, 366 (1939). Aside from narrow constitutional constraints, the legislature "has the power to determine who shall assume or occupy the matrimonial relationship within its borders." Id.

> The status of marriage . . . differs from other contracts in this, that the rights, obligations or duties arising from it are not left entirely to be regulated by the agreement of the parties, but are to a certain extent matters of municipal regulation over which the parties have no control by any declaration of their will.

Herring v. Wickham, 70 Va. (29 Gratt.) 628, 635 (1878) (quoting Duntze v. Levett (Dec. 21, 1816), in James Fergusson, Reports of Some Recent Decisions by the Consistorial Court of Scotland App. at 397 (1817)).

> Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature. That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution.

Maynard v. Hill, 125 U.S. 190, 205 (1888).

The importance of marriage prompted legislative attention early in Virginia's history. Indeed, "the formal validity of marriage took a substantial share of the legislation" promulgated before independence. Dominik Lasok, Virginia Bastardy Laws: A Burdensome Heritage, 9 Wm. & Mary L. Rev. 402, 414 (1967); see Offield v. Davis, 100 Va. 250, 253-55, 40 S.E. 910, 911 (1902) (detailing statutory marriage formalities enacted from 1631 to 1849). One early law, proclaimed in

- 6 -

1628, forbade marriage "'without lycence,' or asking in church."  1 <u>Statutes at Large in Virginia</u> 130 (William Waller Hening ed., 2d ed. 1823).[2]  This general requirement of license or banns remained in force until 1849, <u>see</u> <u>Offield</u>, 100 Va. at 253-55, 40 S.E. at 911, when the General Assembly enacted a revised Code to specify that "[e]very marriage in this state shall be under a license, and solemnized in the manner herein provided," Code tit. 31, ch. 108, § 7 (1849).  That statute's requirements remain materially unchanged in our current Code § 20-13.

For nearly its entire history, from the earliest colonial times down to the present day, the legislature has spelled out what formalities are required to contract a lawful marriage in Virginia. It has long stated what sorts of formal defects will not affect a marriage's validity.  <u>See</u> Code § 20-31; Code tit. 31, ch. 108, § 7 (1849) (addressing a marriage performed by a celebrant professing, but lacking, authority to solemnize marriages).

B.  Lawful marriage is presumed.

"The public policy of Virginia . . . has been to uphold the validity of the marriage status as for the best interest of society, except where marriage is prohibited between certain persons." <u>Needam v. Needam</u>, 183 Va. 681, 686, 33 S.E.2d 288, 290 (1945).  "The presumption of marriage from cohabitation apparently matrimonial is one of the strongest presumptions known to the law."  <u>Eldred v. Eldred</u>, 97 Va. 606, 625, 34 S.E. 477, 484 (1899).  Further, a properly recorded, returned, and certified marriage certificate "shall be prima facie evidence of the facts therein set forth in all courts of this Commonwealth."  Code § 20-20.  However, these are not conclusive presumptions.  A party can defeat the presumption of lawful marriage but only by "clear, cogent,

---

[2] This "asking in church" was also known as "publication of banns."  <u>See, e.g.</u>, Act of Mar. 1, 1819, ch. 106, <u>reprinted in</u> 1 <u>Statutes at Large</u>, <u>supra</u>, at 393-94.  "The practice was to announce the marriage, usually on three successive Sundays preceding the nuptials, that any objection on the ground of relationship or other disability might be brought forward."  1 George Elliott Howard, <u>A History of Matrimonial Institutions</u> 361 (1904); <u>see also</u> Thomas Jefferson, <u>Notes on the State of Virginia</u> 193-94 (2d Am. ed. 1794).

and convincing evidence." Rahnema v. Rahnema, 47 Va. App. 645, 664, 626 S.E.2d 448, 458 (2006) (quoting 2 John W. Strong, McCormick on Evidence § 344, at 449 (5th ed. 1999)).

C. Virginia law requires a license, followed by solemnization, to contract a lawful marriage.

Code § 20-13, titled "License and solemnization required," provides that "[e]very marriage in this Commonwealth shall be under a license and solemnized in the manner herein provided." This statute establishes two requirements for a valid marriage: a license and solemnization. Code § 20-13 does not expressly state that the license must precede solemnization, but that is its most reasonable reading. A license "confer[s] a right to do something which otherwise one would not have the right to do; it is a prerequisite to the right to . . . do certain acts." Commonwealth v. Shell Oil Co., 210 Va. 163, 166, 169 S.E.2d 434, 437 (1969). By analogy, where such a license is required, one cannot drive, hunt, or practice law or medicine before acquiring the necessary license. By the same token, one cannot marry before acquiring a marriage license. A marriage license "grants a couple permission to marry." Marriage license, Black's Law Dictionary (10th ed. 2014). Code § 20-13 thus indicates that, to contract a lawful marriage in Virginia, the parties must obtain a license and, afterward, solemnize their union under that license.

To the extent there might be any doubt on the subject, however, other statutes dispel it. Most significantly, Code § 20-28 provides that, "[i]f any person knowingly perform the ceremony of marriage without lawful license, or officiate in celebrating the rites of marriage without being authorized by law to do so, he shall be confined in jail not exceeding one year, and fined not exceeding $500." By attaching a criminal penalty to the performance of a ceremony of marriage without a license, the General Assembly clarified its intention that a lawful marriage be contracted by solemnization after a license has been obtained. See Offield, 100 Va. at 254, 40 S.E. at 911 (construing a forerunner statute to similar effect).

- 8 -

Code § 20-14.1 bolsters this conclusion. It provides as follows:

> Every marriage license issued under § 20-14 *shall constitute*
> *authority for a period of only sixty days from the date of issuance*
> *for the solemnization of a marriage of the licensees.* Whenever
> such sixty-day period shall have elapsed without the solemnization
> of a marriage of the licensees, the license shall expire.
>
> The provisions of this section shall not be construed to prevent
> licensees from applying for or receiving an additional license,
> either before or after expiration of any license, but no new license
> shall be issued except in compliance with all provisions of law
> applicable to the issuance of a license in the first instance.

Code § 20-14.1 (emphasis added). This statute plainly contemplates a specific order: the parties

must obtain a license and, within the sixty days following, solemnize their union. If a ceremony

does not occur within that time, the license expires. At that point, if the parties still wish to be

married, they must apply for a new license.

Finally, "[t]he clerk issuing any marriage license shall require the parties contemplating

marriage to state, under oath, the information required to complete the application for marriage

license," Code § 20-16, and "[e]very person who officiates at a marriage ceremony shall certify

to the facts of marriage and file the record in duplicate with the officer who issued the marriage

license within five days after the ceremony . . . ," Code § 32.1-267(C). These statutes further

make plain the General Assembly's intent that a license must precede the solemnization

ceremony.

When MacDougall and Levick held their marriage ceremony, it was not "under a

license." The clear, cogent (indeed, undisputed) evidence is that they obtained a license only

*after* holding the ceremony. As our statutes indicate,[3] this does not conform to the requirements

of Virginia law.

---

[3] Although we do not discuss them in detail, we do not overlook the language of other related statutes, which further supports the conclusion that the parties must obtain a marriage license before holding the marriage ceremony. See, e.g., Code § 20-14 ("Every license *for a*

D.  The parties never solemnized a marriage "under a license."

MacDougall contends that the parties did, in fact, solemnize their marriage after they obtained a license.  She argues that "the fact of mailing the license to the Rabbi coupled with the prior understanding that it would be an act communicating their assent to marriage also was sufficient to constitute a solemnization after the issuance of the license."  She further argues that no Virginia authority defines "solemnization" and maintains that submitting the license to the rabbi, having already exchanged vows before him, was solemnization as the parties chose to define it.

In analyzing a statute, we give each word "its ordinary meaning, given the context in which it is used."  Sansom v. Bd. of Supervisors, 257 Va. 589, 594-95, 514 S.E.2d 345, 349 (1999) (quoting Dep't of Taxation v. Orange-Madison Coop. Farm Serv., 220 Va. 655, 658, 261 S.E.2d 532, 533-34 (1980)).  To "solemnize" means "[t]o enter into (a marriage, contract, etc.) by a formal act, usu[ally] before witnesses."  Solemnize, Black's Law Dictionary, supra; see also Webster's Third New International Dictionary 2168 (unabr. 2002) (defining "solemnize" as "to perform with pomp or ceremony or according to legal forms; *esp* : to unite a couple in (marriage) with religious ceremony : celebrate (a marriage) with religious rites").

As our Supreme Court has noted, "[t]he state has no official interest in the place where a marriage occurs, or in the ceremony or ritual which surrounds the act."  Cramer v. Commonwealth, 214 Va. 561, 565, 202 S.E.2d 911, 914 (1974) (per curiam).  Under Virginia law, "[n]o particular form of marriage ceremony is required."  Alexander v. Kuykendall, 192 Va.

---

*marriage* shall be issued by the clerk or deputy clerk of a circuit court of any county or city." (emphasis added)); Code § 20-30 ("The clerks of the circuit courts . . . are authorized to issue marriage licenses . . . to any persons *desiring to be married* on any of the government reservations of this Commonwealth, . . . ." (emphasis added)).

- 10 -

8, 11, 63 S.E.2d 746, 748 (1951). Indeed, acceptable practice varies from, for example, formal church ceremonies, to relaxed beachfront solemnizations, to (as here) celebrations in the home.

Mailing a license via express mail for a signature when the parties are not even present does not constitute "solemnization" under any reasonable definition of the term.[4]

E. Virginia's statutory formalities for contracting a lawful marriage are mandatory, not directory.

In <u>Offield</u>, 100 Va. at 251, 40 S.E. at 910, our Supreme Court considered

> whether or not a contract, if proved, entered into between a man and
> a woman . . . by which they mutually agreed to become husband and
> wife, without any celebration and without license, constitutes a valid
> marriage in this State . . . . In other words, is a common law
> marriage entered into in this State valid?

The Court answered that question in the negative, observing that Virginians, "from the passage of our earliest statutes on the subject of marriage," had regarded the statutory formalities as mandatory rather than directory. <u>Id.</u> at 260, 40 S.E. at 913. The Court acknowledged that this holding "may result in hardship in some cases" but took the view that "the lesser injury will come from an adherence to the statutory requisites than otherwise." <u>Id.</u> at 261, 40 S.E. at 914 (quoting <u>In re Estate of McLaughlin</u>, 30 P. 651, 659 (Wash. 1892)). The Court observed that "[o]ur marital laws are plain and simple, not difficult to understand by the humblest citizen." <u>Id.</u> at 262-63, 40 S.E. at 914 (quoting <u>Eldred</u>, 97 Va. at 629, 34 S.E. at 485). The Court concluded, "no marriage or attempted marriage, if it took place in this State, can be held valid here, unless it has been shown to have been under a license, and solemnized according to our statutes." <u>Id.</u> at 263, 40 S.E. at 914. Although <u>Offield</u> dealt with facts different from those now before us, the

---

[4] We reached a similar conclusion in <u>Davidson v. Davidson</u>, No. 2356-08-3, 2009 Va. App. LEXIS 313, at *4-5 (Va. Ct. App. July 14, 2009) ("The marriage license presupposes a 'marriage ceremony' solemnizing the union. And whatever formalities the ceremony requires, at the very least it requires the attendance of both the prospective bride and groom . . . ." (quoting Code § 32.1-267(C))).

underlying rationale of the decision makes clear that, to lawfully marry in Virginia, a couple must follow the requirements of the statute.

F.  The parties never married under Virginia law.

MacDougall counters that the trial court erred in breaking down the process they employed into "unrelated, discrete events," rather than viewing it as a continuum.  But a simple sequence of events is precisely what Code § 20-13 requires.  First, the parties must obtain a marriage license.  Second, the parties must participate in a ceremony of some kind, however brief or formal, to solemnize their marriage.

"Marital status, of course, arises not from the simple declarations of persons nor from the undisputed claims of litigants.  It is rather created and dissolved only according to law."  Hames v. Hames, 316 A.2d 379, 382 (Conn. 1972) (citation omitted).  And we "can but construe the law as it is written," Eldred, 97 Va. at 629, 34 S.E. at 486, and "[t]here is no authority for the parties by their actions outside of the law to invest the courts with power to treat a relationship as a lawful marriage," Shoustari v. Zamani, 39 Va. App. 517, 520, 574 S.E.2d 314, 315 (2002) (quoting Kleinfield v. Veruki, 7 Va. App. 183, 190, 372 S.E.2d 407, 411 (1988)).

"It is not for this court to devise means of making marriage difficult.  It is our duty, however, to recognize the law as it exists."  Hames, 316 A.2d at 385.  Applicable statutes and cases all point to the inescapable conclusion:  the parties' failure to follow the formal requirements to contract a lawful marriage means that they never married under Virginia law.  It is undisputed that MacDougall and Levick did not have a license when they held their marriage ceremony; thus, their marriage ceremony was not "under a license."  Code § 20-13.  When they did obtain a license, several weeks later, they did not perform any kind of solemnization.  Virginia's statutory formalities for contracting marriage are mandatory – not merely aspirational.  It is clear that the parties did not fulfill these requirements and, therefore, did not contract a

lawful marriage.  Accordingly, we affirm the trial court's decree that the parties never married

under Virginia law.[5]

      III. NEITHER THE CURATIVE STATUTE NOR EQUITABLE DOCTRINES COMPEL A
          DIFFERENT OUTCOME.

        A.  Code § 20-31, the curative statute, does not apply.

The General Assembly has enacted the following curative statute, titled "Belief of parties

in lawful marriage validates certain defects":

> No marriage solemnized under a license issued in this
> Commonwealth by any person professing to be authorized to
> solemnize the same shall be deemed or adjudged to be void, nor
> shall the validity thereof be in any way affected on account of any
> want of authority in such person, or any defect, omission or
> imperfection in such license, if the marriage be in all other respects
> lawful, and be consummated with a full belief on the part of the
> persons so married, or either of them, that they have been lawfully
> joined in marriage.

Code § 20-31.  The trial court's interpretation of this statute is a question of law, which we

review *de novo*.  See Gilliam v. McGrady, 279 Va. 703, 708, 691 S.E.2d 797, 799 (2010).  For

several reasons, we conclude that this statute does not apply.  First, the parties did not solemnize

their marriage "under a license" – a prerequisite to the application of this statute.  Second, the

defects Code § 20-31 aims to cure, "any want of authority" in the person performing the

marriage and "any defect, omission or imperfection in [the marriage] license," are not present

here.[6]  Nothing in the record indicates that Rabbi Biber lacked the authority to perform

weddings, and the license was not defective in any way – there was no license when the

---

[5] Although the decisions are sparse, other courts facing a similar situation have reached the same conclusion.  See, e.g., In re Khalil, No. 2001/183, 2003 U.S. Dist. LEXIS 6229 (D.V.I. Apr. 4, 2003) (per curiam); Pinkhasov v. Petocz, 331 S.W.3d 285 (Ky. 2011); Kisla v. Kisla, 19 S.E.2d 609 (W. Va. 1942) (applying a West Virginia statute derived and materially indistinct from our Code tit. 31, ch. 108, § 7 (1849)).

[6] MacDougall argues that the parties relied on the rabbi's authority to sign a subsequently issued marriage license when, in fact, he lacked the authority to do so.  Code § 20-31

- 13 -

ceremony was performed.  When the parties did obtain a license, there was no defect associated with it.  The medicine in Code § 20-31's cabinet is not formulated so as to spring to life a marriage that, in the eyes of Virginia law, never was.

### B.  The marriage was voidable rather than void *ab initio*.

MacDougall, contending that her marriage is voidable rather than void, offers a final line of defense by invoking equitable doctrines.  Specifically, she argues that laches and estoppel preclude Levick from challenging the marriage's validity.  Levick, in contrast, argues that a purported marriage like this one is void *ab initio*.

Initially, we agree with MacDougall's contention that the defect here rendered the marriage voidable.  In determining whether the marriage is void *ab initio* or voidable, Code § 20-89.1 sheds little light on the void/voidable distinction, because it provides that "[w]hen a marriage is alleged to be *void or voidable* for any of the causes mentioned in §§ 20-13 . . . and upon proof of the nullity of the marriage, it shall be decreed void by a decree of annulment."  (Emphasis added).  This code section does not specify that a marriage like this one is void "*ab initio"* or "voidable," only that if the marriage is contracted in violation of Code § 20-13, it is to be held "void" by decree of annulment.

The common law drew a distinction between "canonical" impediments, that is, impediments to marriage drawn from church or canon law, such as consanguinity, affinity, and impotence, which rendered a marriage voidable, and "civil" impediments, such as bigamy and lack of mental capacity, which rendered a marriage void *ab initio*.  Toler, 173 Va. at 432, 4 S.E.2d at 367.  Levick argues that the impediment here is not canonical and, therefore, it must be a civil one that renders the marriage void *ab initio*.  The General Assembly, however, has

contemplates the want of authority in an officiant who, while "professing to be authorized to solemnize" the marriage, has not actually been authorized to "celebrate the rites of matrimony in this Commonwealth" under Code §§ 20-23, -25, or -26.

- 14 -

comprehensively regulated marriage by statute, including regulations directed at what previously

constituted canonical impairments. See Code § 20-38.1 (listing marriages, such as between

brother and sister and others, that are prohibited); Code § 20-45.1 (specifying that such marriages

under Code § 20-38.1 are void). We are reluctant to declare a marriage void *ab initio* for failing

to comply with Code § 20-13 when the General Assembly has not taken that step. This

conclusion is consistent with the holding in Payne v. Commonwealth, 201 Va. 209, 211, 110

S.E.2d 252, 254 (1959), where the Supreme Court held that

> In Virginia there is no statutory provision declaring that marriages
> involving persons under the age of consent are either void or
> voidable, and there are no Virginia cases so holding. Under the
> circumstances here, the marriage of the parties was voidable only
> and not void. . . . The parties are husband and wife unless and until
> the marriage is annulled.

According to Bishop's influential treatise,[7]

---

[7] Many decisions of the Supreme Court cite Bishop's treatise as authoritative. See, e.g., Wallihan v. Hughes, 196 Va. 117, 123, 82 S.E.2d 553, 558 (1954) (citing 1 Joel Prentiss Bishop, New Commentaries on Marriage, Divorce, and Separation § 1261, at 539 (1891) [hereinafter "Bishop, Marriage, Divorce, and Separation"]); Arrington v. Arrington, 196 Va. 86, 93, 95, 82 S.E.2d 548, 552-53 (1954) (citing 1 Bishop, Marriage, Divorce, and Separation § 1261, at 539; 2 Bishop, Marriage, Divorce, and Separation § 696, at 286); Anderson v. Anderson, 196 Va. 26, 29-30, 82 S.E.2d 562, 565 (1954) (overruled by Petachenko v. Petachenko, 232 Va. 296, 350 S.E.2d 600 (1986)) (citing 1 Bishop, Marriage, Divorce, and Separation § 15, at 7); Foster v. Foster, 195 Va. 102, 106, 108-09, 77 S.E.2d 471, 474-75 (1953) (citing 2 Bishop, Marriage, Divorce, and Separation §§ 858, 1161, at 349, 453); Shelton v. Stewart, 193 Va. 162, 166, 67 S.E.2d 841, 843 (1951) (citing 2 Bishop, Marriage, Divorce, and Separation § 696, at 286); Menefee v. Commonwealth, 189 Va. 900, 910, 55 S.E.2d 9, 14-15 (1949) (citing 2 Bishop, Marriage, Divorce, and Separation § 1663, at 634); Haskins v. Haskins, 188 Va. 525, 530, 534, 50 S.E.2d 437, 439, 441 (1948) (citing 2 Bishop, Marriage, Divorce, and Separation §§ 340, 365, 370, 1359-60, at 165, 174-75, 520); Needam v. Needam, 183 Va. 681, 686, 33 S.E.2d 288, 290 (1945) (citing 1 Bishop, Marriage, Divorce, and Separation §§ 571-72, 582, at 244-45, 249-50); Pretlow v. Pretlow, 177 Va. 524, 538, 14 S.E.2d 381, 385 (1941) (citing 2 Bishop, Marriage, Divorce, and Separation § 803, at 327); Holt v. Holt, 174 Va. 120, 123, 5 S.E.2d 504, 505 (1939) (citing 2 Bishop, Marriage, Divorce, and Separation §§ 1359-60, at 520-21); Toler, 173 Va. at 429, 432, 4 S.E.2d at 366-67 (citing 1 Bishop, Marriage, Divorce, and Separation §§ 258, 267, 841 at 107, 113, 359-60); Martin v. Martin, 166 Va. 109, 117, 184 S.E. 220, 224 (1936) (citing 2 Bishop, Marriage, Divorce, and Separation § 1351, at 517-18); Counts v. Counts, 161 Va. 768, 775, 172 S.E. 248, 250 (1934) (citing 2 Bishop, Marriage, Divorce, and Separation § 527, at 234-35); Kirby v. Kirby, 159 Va. 544, 555-56, 559, 166 S.E. 484, 487-89 (1932) (citing 2

A marriage is termed void when it is good for no legal purpose, and its invalidity may be maintained in any proceeding, in any court, between any parties, whether in the lifetime or after the death of the supposed husband and wife, and whether the question arises directly or collaterally.

1 Joel Prentiss Bishop, New Commentaries on Marriage, Divorce, and Separation § 258, at 107 (1891).

In contrast,

[a] marriage is voidable when in its constitution there is an imperfection which can be inquired into only, during the lives of both of the parties, in a proceeding to obtain a sentence declaring it null. Until set aside, it is practically valid; when set aside, it is rendered void from the beginning.

Id. at § 259, at 107-08.

Bishop's summary is consistent with Virginia law. In Toler, the Supreme Court embraced the passage we cite above, noting that

[a] void marriage confers no legal rights, and, when it is determined that the marriage is void, it is as if no marriage had ever been performed. . . . A voidable marriage differs from a void marriage in that it may be afterwards ratified by the parties . . . and usually is treated as a valid marriage *until it is decreed void*.

---

Bishop, Marriage, Divorce, and Separation §§ 1351, 1359-61, at 517-18, 520-21); Barnes v. American Fertilizer Co., 144 Va. 692, 710, 130 S.E. 902, 907 (1925) (citing 2 Bishop, Marriage, Divorce, and Separation § 884, at 356-57); Harman v. Harman, 139 Va. 508, 541-42, 124 S.E. 273, 282-83 (1924) (citing 2 Bishop, Marriage, Divorce, and Separation § 304, at 148-49); Kirn v. Kirn, 138 Va. 132, 134, 120 S.E. 850, 851 (1924) (overruled by Haskins, 188 Va. 525, 50 S.E.2d 437) (citing 2 Bishop, Marriage, Divorce, and Separation § 340, at 165); Cumming v. Cumming, 127 Va. 16, 25, 29-30, 102 S.E. 572, 574, 576 (1920) (citing 1 Bishop, Marriage, Divorce, and Separation §§ 1261, 1277, at 539, 546; 2 Bishop, Marriage, Divorce, and Separation § 663, at 276); Shelton v. Shelton, 125 Va. 381, 383, 99 S.E. 557, 557 (1919) (citing 2 Bishop, Marriage, Divorce, and Separation §§ 698, 704, at 286-87, 289); Craig v. Craig, 118 Va. 284, 292, 87 S.E. 727, 730 (1916) (citing 1 Bishop, Marriage, Divorce, and Separation § 1757, at 730); Owens v. Owens, 96 Va. 191, 195-96, 31 S.E. 72, 74 (1898) (citing 1 Bishop, Marriage, Divorce, and Separation § 1569, at 651-52; 2 Bishop, Marriage, Divorce, and Separation §§ 269, 304, at 134-35, 148-49); Hutchins v. Hutchins, 93 Va. 68, 71, 24 S.E. 903, 904 (1896) (citing 1 Bishop, Marriage, Divorce, and Separation § 1587, at 659).

173 Va. at 432, 4 S.E.2d at 367 (emphasis added) (quoting Frank H. Keezer, The Law of Marriage and Divorce, § 24, at 16 (1906)); see also Alexander, 192 Va. at 13, 63 S.E.2d at 748-49.[8]

Whether void or voidable, either way, a declaration that an attempted marriage like this one is void results in a judicial declaration that the marriage is a nullity.[9] The difference lies in who can challenge the marriage and when such a challenge can be raised. The General Assembly has not declared a marriage like this one to be void *ab initio*. It has done so for bigamous marriages. Code § 20-43 ("All marriages which are prohibited by law on account of either of the parties having a former wife or husband then living shall be absolutely void, without any decree of divorce, or other legal process."). This legislative silence suggests a voidable marriage rather than one that is void *ab initio*. See Marblex Design Int'l, Inc. v. Stevens, 54 Va. App. 299, 304, 678 S.E.2d 276, 278 (2009) (stating that a sham/green card marriage is not included among the statutes specifying which marriages are void, therefore, such a marriage is voidable). A number of other courts have similarly found legislative silence dispositive in concluding that formal defects in contracting a marriage rendered the marriage voidable rather than void *ab initio*. See Barrons v. United States, 191 F.2d 92, 98-99 (9th Cir. 1951); Hames, 316 A.2d at 385; Dodrill v. Dodrill, 2004 Ohio App. LEXIS 1977, at *9 (Ohio Ct. App. 2004).

---

[8] The parties have not raised the question of whether and how ratification would work in a situation like this one. Cf. Toler, 173 Va. at 432, 4 S.E.2d at 367. Accordingly, we do not address this question.

[9] By statute, not all voidable marriages result in a retrospective declaration of voidness. See Code § 20-45.1(b) (providing that marriages solemnized when either party lacked capacity to consent by virtue of mental incapacity or infirmity are void from the date so declared). Since the defect at issue here goes to the creation of the marriage, the declaration of voidness is retrospective.

Like those courts, we conclude that the parties' purported marriage was voidable, not void *ab initio*.[10]

The consequences of a contrary holding do not escape our notice. If such marriages are deemed void *ab initio*, anyone could challenge the validity of the marriage, at any time. Thus, for example, disgruntled heirs could preclude a mother from inheriting under the intestacy statutes (or receiving her elective share under a will) if the ceremony preceded the marriage license. An insurance company could seek to shed life insurance, workers' compensation, or health insurance obligations by attacking the validity of a marriage. Children could be portrayed as illegitimate even though they and their parents thought the marriage was a valid one.[11] Although we find ourselves constrained by our existing statutory scheme to declare the marriage void upon a challenge by the husband to its validity, we see little reason to take a further and highly disruptive step by holding such marriages void *ab initio*, particularly when nothing in Virginia statutes or precedent compels that conclusion.

---

[10] Levick contends that our finding that such a purported marriage is voidable rather than void contradicts Offield, which he contends ruled all marriages not properly solemnized under license "illegal and void." 100 Va. at 261, 40 S.E. at 914. First, we also find such marriages illegal and void. We do not, however, find that such marriages are void "*ab initio*" – something Offield did not state. Second, the full sentence that Levick excerpts states as follows: "None of these authorities [addressing whether statutory formalities are mandatory or directory], however, question the power of the Legislature, by plain language or clear implication, to declare all marriages or pretended marriages not entered into in accordance with the requirements of the statute illegal and void." Id. at 261, 40 S.E. at 913-14. This passage does not bear the weight Levick places on it. It does not answer or even address the question before this Court, whether a ceremony that precedes a marriage license, followed by a license obtained without a ceremony "under license" is voidable or void *ab initio*. This passage from Offield simply states that legislatures can (1) regulate how and when a marriage is entered into and (2) specify the consequences for failing to follow those requirements.

[11] We acknowledge Code § 20-31.1, which provides, in relevant part, that "[t]he issue of marriages prohibited by law, deemed null or void or dissolved by a court shall nevertheless be legitimate." Legitimation in the eyes of the law will not always palliate the stigma that might be inflicted on such children.

Levick argues that finding marriages like this one voidable rather than void *ab initio* would be tantamount to recognizing common law marriages, in contravention of longstanding Virginia public policy. We disagree. First, the parties here in fact held a ceremony and obtained a marriage license, and, except for performing the ceremony under license, otherwise fulfilled the obligations imposed on them by law such as filing the marriage certificate in the clerk's office. Therefore, unlike common law marriages, where no celebration was necessary and where there was no necessity of record evidence attesting to the parties' marriage, the parties here attempted (but failed) to follow the strictures of the law. Second, a marriage like this one can in fact be declared void once the parties move to set it aside. We certainly do not ignore the strictures of Code § 20-13; we simply conclude that such purported marriages like this one are best treated as voidable rather than void *ab initio*.[12]

For her part, MacDougall argues that if the marriage is voidable, she should be entitled to equitable distribution and spousal support. She relies on McConkey v. McConkey, 216 Va. 106, 215 S.E.2d 640 (1975), and Payne, 201 Va. 209, 110 S.E.2d 252. In McConkey, the Supreme Court observed that "[a] voidable marriage is '*usually* treated as a valid marriage until it is decreed void.'" 216 Va. at 107, 215 S.E.2d at 641 (emphasis added) (quoting Toler, 173 Va. at 432, 4 S.E.2d at 367). First, neither McConkey nor Payne specifically addresses what remedy is appropriate in a situation like the one before us. Second, McConkey and Toler contain an important qualifier: the Court was careful to say that a voidable marriage is "usually" treated as a valid marriage until it is decreed void. This is not the "usual" case because we conclude that there was no marriage. Our conclusion that the parties were never married means that

---

[12] Levick also contends that our decision will require Virginia to retroactively ratify same-sex marriages that were entered into prior to the Supreme Court's decision in Obergefell v. Hodges, 135 S. Ct. 2584 (2015). Our decision in this case simply has no bearing on that issue. Accordingly, we decline to address in advisory fashion a question of law not before this Court.

MacDougall cannot obtain the distribution of marital property through equitable distribution because no marital estate ever existed, and neither can she obtain post-divorce spousal support, because in the eyes of the law she was never a spouse to Levick.

### C. Equitable doctrines do not apply.

We generally reject the application of equitable doctrines in modern divorce suits because this body of law is now chiefly statutory in character. See Bajgain v. Bajgain, 64 Va. App. 439, 457-58, 769 S.E.2d 267, 276 (2015).[13] Assuming, however, without deciding, that these equitable doctrines can be brought to bear in the context of annulment litigation, we nevertheless conclude that these equitable doctrines do not apply here.

"Laches is the neglect or failure to assert a known right or claim for an unexplained period of time under circumstances prejudicial to the adverse party." Princess Anne Hills Civic League, Inc. v. Susan Constant Real Estate Trust, 243 Va. 53, 58, 413 S.E.2d 599, 602 (1992). "The burden of proving laches is upon the party who asserts it." Id. The "[e]lements necessary to establish equitable estoppel, absent a showing of fraud and deception, are a representation, reliance, a change of position, and detriment." Lataif v. Commercial Indus. Constr., Inc., 223 Va. 59, 63, 286 S.E.2d 159, 161 (1982) (quoting T v. T, 216 Va. 867, 873, 224 S.E.2d 148, 152 (1976)). "Because the doctrine of estoppel prevents the showing of the truth, it is applied rarely and only from necessity." Princess Anne Hills Civic League, 243 Va. at 59, 413 S.E.2d at 603. "[T]he party who relies upon estoppel must prove each element by clear, precise, and unequivocal evidence." Id.

---

[13] We note our Supreme Court's discussion of a forerunner to Code § 20-89.1: "Divorce is the creature of statute; annulment rests within the inherent power of equity, inherited by it from the ecclesiastical courts of England." Pretlow v. Pretlow, 177 Va. 524, 548-49, 14 S.E.2d 381, 387 (1941); cf. Heflinger, 136 Va. at 296, 118 S.E. at 318 ("The right to bring a suit for annulment is expressly given by . . . the Code, but this is probably merely declaratory of a pre-existing ground of equitable jurisdiction.").

The Supreme Court applied the principles of unclean hands, equitable estoppel, and "estoppel by laches" in McNeir v. McNeir, 178 Va. 285, 290-91, 16 S.E.2d 632, 633-34 (1941). In that case, the former wife had challenged the validity of a *divorce* decree, not a marriage. Id. at 289, 16 S.E.2d at 633. With respect to "estoppel by laches," the Court held that the doctrine barred the former wife from challenging the validity *of the divorce* because she did not challenge it until four years after obtaining the decree. The Court concluded that "she must have known" that her former husband had remarried and yet she took no prompt action to set aside the divorce decree. Id. at 291, 16 S.E.2d at 633-34. The Court explained the rationale for barring the challenge to the divorce decree:

> The safety of society imperatively demands that one who seeks to overthrow an apparently valid decree of divorce should proceed with the utmost promptness upon discovery of the facts claimed to show its invalidity. It must be apprehended that a man who has secured a decree of divorce, valid on its face, may endeavor to marry again, thus entangling some innocent woman in most intolerable difficulties, should the divorce be afterwards annulled. In such a case, one who seeks the aid of equity should, *in limine,* make it appear that she has proceeded in good faith and with reasonable diligence.

Id. at 292, 16 S.E.2d at 634 (quoting Dry v. Rice, 147 Va. 331, 340, 137 S.E. 473, 475-76 (1927)). Those principles, which govern challenges to the validity of a *divorce*, are inapplicable in a suit seeking a declaration that a *marriage* was never lawfully contracted. In addition, unlike the wife in McNeir who failed to act with "utmost promptness" in learning of the problems associated with the divorce, Levick acted promptly upon discovering that the marriage might have been, or was, invalid.

Furthermore, both Levick and MacDougall were aware of the fact that the marriage had taken place without a license.

> It is essential to the application of the principles of equitable estoppel, or estoppel *in pais,* that the party claiming to have been influenced by the conduct or declarations of another to his injury,

- 21 -

> was not only ignorant of the true state of facts, but had no convenient and available means of acquiring such information, and where the facts are known to both parties, and both had the same means of ascertaining the truth, there can be no estoppel.

Fitzgerald v. Fitzgerald, 194 Va. 925, 930, 76 S.E.2d 204, 207 (1953) (quoting Lindsay v. James, 188 Va. 646, 659, 51 S.E.2d 326, 332 (1949)).  Here, the parties were equally knowledgeable about the operative facts.

MacDougall, citing decisions from other states, also urges us to adopt the concept of marriage by estoppel.  We must decline the invitation.  The legislature is the rightful branch of government to set Virginia's public policy with regard to an institution so foundational, and of such paramount importance to society, as marriage.  This area of Virginia law has been comprehensively regulated since 1628, if not earlier, and it is for the General Assembly to consider any modification to the statutory formalities for contracting lawful marriage. [14]

IV.  THE TRIAL COURT DID NOT ERR IN SETTING ASIDE THE PARTIES' MARITAL AGREEMENT.

On July 20, 2009, the parties entered into a marital agreement that spelled out Levick's obligations to MacDougall in the event of a separation or divorce.  Following Levick's successful challenge to the validity of the marriage, he persuaded the trial court to set aside this agreement on the ground that it was the product of mutual mistake of fact.  MacDougall challenges the trial court's ruling setting aside the agreement.

---

[14] Fashioning a rule to uphold an attempted marriage like this one raises a number of policy questions.  Should such an attempted marriage be upheld, or should the parties suffer the consequences for their neglect of what are, after all, simple and longstanding statutory requirements?  If the marriage is to be sustained, how should that be done?  Should it be accomplished through a statute of repose that would foreclose litigation challenging the validity of the attempted marriage past a certain date, or by amending the curative statute and allowing such an attempted marriage to be considered valid when the ceremony had taken place within a certain time before obtaining the license?  The existence of these and other alternatives strengthens our conclusion that the question is one of policy and, therefore, for the legislative branch to address (or not) as it deems fit.

A. The record supports the trial court's determination that Levick's waiver did not encompass a claim of mutual mistake of fact.

Following extensive litigation on the subject, the trial court found that Levick had made a "knowing, explicit, voluntary, valid *bona fide* waiver" of his right to challenge the validity of the marital agreement. MacDougall argues that the trial court erred in allowing Levick to challenge the validity of the marital agreement, despite this waiver.

Before making this waiver, Levick had challenged the agreement on various grounds but, notably, he had not raised any argument concerning a mutual mistake of fact with regard to the parties' marital status.[15] Thus, when the trial court found this waiver, Levick had not yet discovered or invoked the ground that led to the eventual annulment. The trial court found that Levick did not knowingly waive his right to seek rescission of the marital agreement on the basis of mutual mistake of fact because he was unaware of that claim's availability when he waived.

A "waiver is an *intentional* relinquishment of a known right," Stanley's Cafeteria, Inc. v. Abramson, 226 Va. 68, 74, 306 S.E.2d 870, 873 (1983),[16] and it is "usually a question for the trier of fact," Link Assocs. v. Jefferson Standard Life Ins. Co., 223 Va. 479, 485, 291 S.E.2d 212, 216 (1982). See also Heinrich Schepers GmbH & Co. v. Whitaker, 280 Va. 507, 515-16, 702 S.E.2d 573, 577 (2010) ("Usually, proof of waiver is a question for the trier of fact." (quoting Mgmt. Enters. v. The Thorncroft Co., 243 Va. 469, 474, 416 S.E.2d 229, 232 (1992))).

---

[15] These grounds included mere agreement to agree, invalidity on its own terms, MacDougall's first material breach, vagueness and uncertainty of terms, unconscionableness and duress, failure to disclose assets and obligations or waiver, revocation by MacDougall's waiver of rights and both parties' abandonment of the agreement, MacDougall's repudiation of the agreement, criminality, and contradiction of Virginia public policy.

[16] Some courts distinguish a waiver from a forfeiture. A forfeiture occurs when a litigant fails to timely assert a right. United States v. Olano, 507 U.S. 725, 733 (1993). A waiver, on the other hand, is "the 'intentional relinquishment or abandonment of a known right.'" Id. (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). There is no dispute that we are dealing with waiver here.

> The essential elements of waiver are knowledge of the facts basic to the exercise of the right and intent to relinquish that right. Waiver of a legal right will be implied only upon clear and unmistakable proof of the intention to waive such right for the essence of waiver is voluntary choice.

Cashion v. Smith, 286 Va. 327, 334, 749 S.E.2d 526, 530 (2013) (quoting Chawla v. BurgerBusters, Inc., 255 Va. 616, 622-23, 499 S.E.2d 829, 833 (1998)). A waiver "must be distinctly made with full knowledge of the rights waived." Link Assocs., 223 Va. at 485, 291 S.E.2d at 216. "[T]he burden rests on the party relying on a waiver . . . to prove the essentials of such waiver . . . by clear, precise and unequivocal evidence." Utica Mut. Ins. Co. v. Nat'l Indem. Co., 210 Va. 769, 773, 173 S.E.2d 855, 858 (1970).

The record supports the trial court's conclusion that Levick waived the right to challenge a marital agreement in a *divorce suit*, i.e. his waiver presupposed the existence of a valid marriage. There is no dispute that, when Levick made this waiver, he was unaware of any claim that he was not legally married. Because waiver is usually a question for the trial court, and because the record supports the trial court's finding that Levick's waiver did not extend to a claim based on the lack of a valid marriage, we affirm the finding of the trial court that Levick did not waive his right to seek rescission of the marital agreement on the basis of mutual mistake of fact.

> B. The trial court properly ordered rescission of the marital agreement on the basis of mutual mistake of fact.

MacDougall next argues that the trial court erred in rescinding the marital agreement because the mutual mistake was one of law, not fact. The law does not support this contention.

"Property settlement agreements are contracts . . . subject to the same rules of formation, validity, and interpretation as other contracts." Boedeker v. Larson, 44 Va. App. 508, 518, 605 S.E.2d 764, 769 (2004) (alteration in original) (quoting Smith v. Smith, 3 Va. App. 510, 513, 351 S.E.2d 593, 595 (1986)). A litigant must "prove by clear and convincing evidence the grounds

- 24 -

alleged to void or rescind the agreement." Webb v. Webb, 16 Va. App. 486, 491, 431 S.E.2d 55, 59 (1993) (quoting Drewry v. Drewry, 8 Va. App. 460, 463, 383 S.E.2d 12, 12 (1989)).

"If certain facts are assumed by both parties as the basis of the contract, and it subsequently appears that such facts did not exist, the contract is inoperative." Va. Iron, Coal & Coke Co. v. Graham, 124 Va. 692, 708, 98 S.E. 659, 664 (1919). "Generally, equity, while relieving mistakes of fact, will not give relief from a mistake of law, except in extraordinary cases." Pigg v. Haley, 224 Va. 113, 125, 294 S.E.2d 851, 859 (1982). Our Supreme Court has explained, however, that this rule is "confined to mistakes of the general rules of law, and does not apply to the mistakes made by individuals as to their own private legal rights and interests, such as to the ownership of property. Those private rights are treated as matters of fact, albeit the result of matters of law." Id. Put another way,

> [w]henever a person is ignorant or mistaken with respect to his own antecedent and existing private legal rights, interests, estates, duties, liabilities, or other relation, either of property or contract or personal status, and enters into some transaction, the legal scope and operation of which he correctly apprehends and understands, for the purpose of affecting such assumed rights, interests, or relations, or of carrying out such assumed duties or liabilities, equity will grant its relief, defensive or affirmative, treating the mistake as analogous to, if not identical with, a mistake of fact.

Burton v. Haden, 108 Va. 51, 58, 60 S.E. 736, 738 (1908) (quoting 2 John Norton Pomeroy, A Treatise on Equity Jurisprudence § 849, at 1498 (3d ed. 1905)).

That is the situation with respect to the marital agreement. When Levick and MacDougall entered into the marital agreement, both were "ignorant or mistaken" about their "antecedent and existing private legal rights" regarding their marriage. Their mutual mistake differs from those in the authority cited by MacDougall. The mistakes at issue in those cases involved mistakes about the application of general principles of law rather than mistakes about an antecedent private right or status that lay at the foundation of an agreement. See Pillow v.

Pillow, 13 Va. App. 271, 275, 410 S.E.2d 407, 410 (1991) (mistake as to tax deductibility of spousal support payments); Piedmont Trust Bank v. Aetna Cas. & Sur. Co., 210 Va. 396, 400-02, 171 S.E.2d 264, 267-68 (1969) (mistake as to scope of coverage of insurance policy).

> C. The marital agreement was not a "family settlement" of a controversy concerning the validity of the marriage or the rescission of the parties' marital agreement.

In an effort to uphold the marital agreement, MacDougall invokes equitable principles that govern the settlement of family disputes. We find those principles inapplicable.

Virginia law favors the "repose of family relationships." Weade v. Weade, 153 Va. 540, 546, 150 S.E. 238, 239 (1929).

> Compromises having for their object the settlement of family difficulties or controversies are favored at law and in equity if at all reasonable. The termination of such controversies is considered a valid and sufficient consideration for the agreement, and the court will go further to sustain it than it would under ordinary circumstances. Accordingly, it has been laid down as a general rule that a family agreement entered into on the supposition of a right, or of a doubtful right, although it afterwards turns out that the right was on the other side, is binding, and the right cannot prevail against the agreement of the parties.

Id. at 548, 150 S.E. at 240 (quoting 12 Corpus Juris, Compromise and Settlement § 16, at 322-23 (1917)). Courts will uphold an agreement the parties have "intentionally entered into . . . to compromise and settle those doubts." Pigg, 224 Va. at 125, 294 S.E.2d at 859.

Whatever anticipated controversy the parties compromised or settled by their marital agreement, it was neither the marriage's validity nor the agreement's rescission. At most, potential property and support controversies, resulting from a divorce or separation, were settled by the agreement. The question of the agreement's rescission for mutual mistake of marital status, however, was not. Such a question was not even anticipated at the time of the agreement's execution. MacDougall does not provide us with any authority that would support extending the "family settlements" doctrine to the settlement of disputes between married, or

purportedly married, couples. A family that faces internal strife will, it is hoped, resume familial harmony upon the resolution of the underlying dispute. The same cannot be said about married or presumptively married parties who are seeking to permanently sunder their bond through a divorce or an annulment. Accordingly, we conclude that the "family settlement" doctrine does not apply here.

 V. THE JUDICIAL DECLARATION THAT THE PARTIES NEVER LAWFULLY MARRIED DOES NOT REQUIRE THE COURT TO ORDER MACDOUGALL TO DISGORGE HER *PENDENTE LITE* OR AGREED SUPPORT.

In his appeal, Levick contends that the trial court erred when it refused to order MacDougall to refund the *pendente lite* and agreed support that he paid before the court declared the marriage void. Levick argues that, once the trial court declared the marriage void *ab initio*, the trial court lacked the authority to impose a *pendente lite* support obligation and should have required MacDougall to return all of the *pendente lite* support she received. He also argues that the support paid under the incorporated marital agreement should have been returned.

A. The trial court had jurisdiction to award *pendente lite* support.

Levick first contends that the trial court lacked jurisdiction when it awarded MacDougall *pendente lite* support. He points us to the language of Code § 20-103(A), which authorizes the court "to compel a spouse to pay any sums necessary for the maintenance and support of the petitioning spouse," and stresses the word "spouse." He contends that MacDougall "is not and was not a 'spouse' to whom such support could be awarded" and, therefore, the trial court had no authority to award her *pendente lite* support.

"A question regarding jurisdiction is a matter of law. 'We review the trial court's statutory interpretations and legal conclusions *de novo*.'" Craig v. Craig, 59 Va. App. 527, 539, 721 S.E.2d 24, 29 (2012) (quoting Navas v. Navas, 43 Va. App. 484, 487, 599 S.E.2d 479, 480 (2004)). As to the jurisdictional point, this litigation began its long journey as a divorce suit,

- 27 -

over which the court plainly had subject matter jurisdiction. "Subject matter jurisdiction is the authority vested in a court by constitution or statute to adjudicate certain categories of disputes." Smith v. Commonwealth, 281 Va. 464, 467, 706 S.E.2d 889, 891 (2011). "The circuit court shall have jurisdiction of suits for annulling or affirming marriage and for divorces . . . ." Code § 20-96. The trial court had subject matter jurisdiction over the divorce and annulment suits. There is no dispute that the court also had jurisdiction over the parties. The court had both subject matter and personal jurisdiction.

Relying on Iron City Savings Bank v. Isaacsen, 158 Va. 609, 164 S.E. 520 (1932), Levick contends that the court did not have "actual jurisdiction" to grant *pendente lite* support. His reliance, however, is misplaced. Iron City Savings Bank had sued to recover a debt from Isaacsen. Id. at 616, 164 S.E. at 522. After the bank obtained a judgment, Isaacsen sought to set it aside for the bank's failure to serve indispensable parties. Id. at 620-22, 164 S.E. at 523-24. The trial court did so and allowed Isaacsen to further participate in the suit, which he successfully defended on the statute of limitations. See id. at 622-23, 164 S.E. at 524. The bank appealed. Id. at 623, 164 S.E. at 524. In rejecting the bank's argument, the Supreme Court addressed the failure to serve indispensable parties, noting that, "[f]or the court to have actual jurisdiction to exercise its potential jurisdiction, it must acquire jurisdiction of the person of *all* the parties necessary or of the *res* necessary to sustain a decree granting the equitable relief prayed." Id. at 624, 164 S.E. at 524-25. Here, the trial court unquestionably had jurisdiction over the parties and, in Iron City's phrasing, both potential and actual jurisdiction.

Of further relevance here, the Court in Iron City observed that "[t]he potential jurisdiction of a court of chancery, when properly invoked, is sufficient to sustain the exercise of the power of the court to do all things necessary or proper to perfect its actual jurisdiction and to preserve the *status quo* while so doing." Id. at 624-25, 164 S.E. at 525. That is precisely the object of

- 28 -

certain interlocutory orders, including *pendente lite* support orders, in divorce and annulment suits. They preserve the status quo until the ultimate entry of the decree of divorce or annulment. An annulment decree in a spouse's favor does not retroactively defeat the jurisdiction to enter interlocutory orders prior to the entry of the annulment decree.

We previously held, in Kleinfield, 7 Va. App. at 190, 372 S.E.2d at 411, that a trial court has the discretion to order *pendente lite* support in an annulment suit "even if the marriage was void." See also Henderson v. Henderson, 187 Va. 121, 127-28, 46 S.E.2d 10, 13 (1948). This conclusion accords with the majority rule,[17] and Levick does not point to any development, since Kleinfield, to undermine the strength of its holding. Annulment and *pendente lite* support are longstanding features of Virginia law; yet, nowhere has the General Assembly provided that a trial court must order the repayment of *pendente lite* support upon a decree of annulment.

Levick's textual argument – that Code § 20-103(A) *pendente lite* support can only be paid to a "spouse" and, therefore, not to MacDougall – is further undercut by that statute's legislative history. The word "spouse" appears in Code § 20-103(A) as the product of a legislative design to make the statute gender neutral. See Comment, Annual Survey of Developments in Virginia Law: Domestic Relations, 61 Va. L. Rev. 1732, 1749 (1975). The

---

[17] "The authorities appear to be quite uniform in holding that trial courts have power to order alimony *pendente lite* and the payment of the expenses of litigation in suits brought . . . to annul the marriage." Poupart v. Dist. Court, 123 P. 769, 770 (Nev. 1912); see, e.g., Peacock v. Peacock, 87 So. 2d 626, 628 (Ala. 1956) (per curiam); Lee v. Lee, 83 S.W.2d 840, 841-42 (Ark. 1935); Pierce v. Otte, 142 P.2d 283, 284 (Colo. 1943) (en banc); Burger v. Burger, 166 So. 2d 433, 436 (Fla. 1964); Frith v. Frith, 18 Ga. 273, 274-75 (1855); Brown v. Brown, 61 N.E.2d 645, 646 (Ind. 1945); Ricard v. Ricard, 121 N.W. 525, 525-26 (Iowa 1909); Troutman v. Sternberg, 446 S.W.2d 635, 635-36 (Ky. 1969); Muwinski v. Muwinski, 200 N.W. 465, 465 (Minn. 1924); Kruse v. Kruse, 85 S.W.2d 214, 217 (Mo. App. 1935); State ex rel. Wooten v. Dist. Court, 189 P. 233, 238-39 (Mont. 1920); Willits v. Willits, 107 N.W. 379, 381 (Neb. 1906); Barnes v. Barnes, 48 A.2d 890, 892 (N.J. 1946); Higgins v. Sharp, 58 N.E. 9, 10 (N.Y. 1900); Lea v. Lea, 10 S.E. 488, 490 (N.C. 1889); Hunt v. Hunt, 100 P. 541, 543-44 (Okla. 1909); Stump v. Stump, 170 A. 393, 394-95 (Pa. Super. 1934); Leckney v. Leckney, 59 A. 311, 312-13 (R.I. 1904); Arey v. Arey, 60 P. 724, 725-26 (Wash. 1900).

statute had provided that a court could order "the man to pay any sums necessary for the maintenance of the woman." 1975 Va. Acts ch. 644. The General Assembly replaced "the man" with "the spouse" and "woman" with "petitioning spouse." Id. This amendment hardly evinces a legislative intent to compel a party to return all *pendente lite* support upon a declaration that the marriage was void.

In short, although a marriage may ultimately be declared void, that does not alter a trial court's power, expressly conferred by statute, to enter certain orders during the pendency of the litigation. Those orders are not rendered retroactively void, even if the marriage ultimately proves to be.

B. The facts and circumstances support the trial court's exercise of discretion in declining to order MacDougall to repay the *pendente lite* support.

Levick next argues that, even if the trial court had the authority to order *pendente lite* support, it should have exercised its discretion to order repayment.[18] This is so, he contends, because MacDougall benefitted financially from the parties' relationship, Levick supported MacDougall and her children during the relationship, and he paid virtually all costs associated with the ownership and care of the home.

"[T]he abuse of discretion standard requires a reviewing court to show enough deference to [the trial court's] judgment that [it] does not reverse merely because it would have come to a different result in the first instance." Lawlor v. Commonwealth, 285 Va. 187, 212, 738 S.E.2d 847, 861 (2013) (quoting Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 322 (4th Cir. 2008)). "Accordingly, 'when a decision is discretionary . . . . the court has a range of

---

[18] MacDougall points us to Reid v. Reid, 245 Va. 409, 429 S.E.2d 208 (1993), to argue that a trial court cannot order a litigant to repay any spousal support. Reid addressed a trial court's authority to order repayment following the entry and reversal of a final order of spousal support. See id. at 411, 429 S.E.2d at 209. Reid did not address a situation, like this one, involving a trial court's authority to order repayment of *pendente lite* support during ongoing trial litigation.

choice, and . . . its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" Id. at 212-13, 738 S.E.2d at 861 (alterations in original) (quoting Landrum v. Chippenham & Johnston-Willis Hosps., Inc., 282 Va. 346, 352, 717 S.E.2d 134, 137 (2011)).

The evidence established a mutually beneficial relationship. Levick was, indeed, a very good provider. His success in business ensured the couple a very high standard of living. On the other hand, Levick benefitted personally and professionally from MacDougall's efforts. She helped him with entertaining and networking. She not only worked without pay for Levick's company but also loaned it money at a crucial juncture. She testified that she contributed her own financial resources for the family's well-being. Furthermore, as MacDougall points out, when the court entered the *pendente lite* orders, there was no claim that the marriage was void. On these facts, we detect no abuse of discretion.

C. The court had jurisdiction to incorporate the parties' agreement on support.

Levick reiterates his jurisdictional arguments to challenge the trial court's authority to incorporate the parties' marital agreement into an order. He also contends that the court could not incorporate the marital agreement, under Code § 20-109.1, because that statute applies to a "party to whom such relief might otherwise be awarded," see Code § 20-109(C), and a non-spouse, he maintains, is not such a party.

Initially, the trial court set monthly *pendente lite* support at $8,000. On August 27, 2012, the trial court entered an order compelling Levick to pay support in accord with the marital agreement. That order superseded the earlier *pendente lite* support orders. In the wake of its ruling that the marriage was void *ab initio*, the court suspended *pendente lite* and agreed support payments, effective November 21, 2013.

The trial court's initial decision to incorporate the parties' marital agreement into its order was not void for lack of jurisdiction. Code § 20-109.1 authorizes a trial court to incorporate property settlement (and certain other) agreements into an order, and Code § 20-109(C) precludes the court from granting relief that does not accord with the incorporated agreement. The trial court had subject matter jurisdiction to act under Code § 20-109.1, and it had jurisdiction over the parties. No jurisdictional impediment precluded the trial court from incorporating the marital agreement into an order, and we reject the argument that the order was retroactively voided by the later annulment decree.

### D. Levick did not request appropriate restitution from the trial court.

Levick contends that the trial court was required to order MacDougall to repay any support expended under the marital agreement, which the court later rescinded for mutual mistake of fact. He cites Hilliard v. Fox, 735 F. Supp. 674 (W.D. Va. 1990), for the general proposition that one who pays money under a mistake of fact is entitled to restitution, and Hall v. Graham, 112 Va. 560, 72 S.E. 105 (1911), to argue that he is entitled to interest on the funds he paid under mutual mistake of fact.

Ordinarily, a contract's rescission, for mistake of fact, allows a party "restitution for any benefit that he has conferred on the other party by way of part performance or reliance." Restatement (Second) of Contracts § 376 (1981). The court's enforcement, by incorporation, of the contractual obligation to pay support did away with the earlier *pendente lite* obligations, which otherwise would have continued. At most, Levick's reliance cost was the difference between the agreed and the *pendente lite* support: $4,500 in monthly support over a period of approximately 17 months. Levick did not request this relief at trial and does not request it on appeal. He has maintained, instead, that he was entitled to a full refund. He is not.

- 32 -

VI. THE COURT COMMITTED NO REVERSIBLE ERROR IN DECLINING TO ORDER
MACDOUGALL TO RETURN PREVIOUS PAYMENTS FOR ATTORNEYS' FEES.

A. The trial court had jurisdiction to order Levick to pay attorneys' fees.

Levick again contends that the trial court lacked jurisdiction to award attorneys' fees once the court determined that the marriage was void. Code § 20-103(A)(ii) authorizes a court "[i]n suits for divorce, annulment and separate maintenance . . . [to] make any order that may be proper . . . to enable such spouse to carry on the suit." "An award of attorney's fees is a matter submitted to the trial court's sound discretion and is reviewable on appeal only for an abuse of discretion." Graves v. Graves, 4 Va. App. 326, 333, 357 S.E.2d 554, 558 (1987).

For the same reasons noted in connection with Levick's challenge to the award of *pendente lite* support, we conclude that the trial court had actual and potential jurisdiction to order Levick to pay attorneys' fees. The trial court had jurisdiction over the divorce and annulment suits and had jurisdiction over the parties. By statute, it could enter various interlocutory orders. The later annulment decree did not render void *ab initio* the interlocutory orders entered in connection with the litigation.

B. The court committed no abuse of discretion in assessing attorneys' fees against Levick.

As with his challenge to the *pendente lite* support order, Levick argues that awarding attorneys' fees constituted an abuse of discretion both for the initial award of $191,288 and the later award of $100,000. He argues that MacDougall was fully aware of the facts that led the trial court to conclude that the marriage was void but, instead of conceding, chose to litigate. He complains of her "obstructionist" conduct and makes much of the trial court's ultimate rejection of her arguments. He argues that, because he ultimately prevailed, MacDougall should not have received additional fees. He also contends that MacDougall demonstrated an ability to pay attorneys' fees.

- 33 -

"The key to a proper award of counsel fees is reasonableness under all the circumstances." Lightburn v. Lightburn, 22 Va. App. 612, 621, 472 S.E.2d 281, 285 (1996) (citing McGinnis v. McGinnis, 1 Va. App. 272, 277, 338 S.E.2d 159, 162 (1985)). In making such an award, a trial court is directed to consider "the circumstance of the parties," Barnes v. Barnes, 16 Va. App. 98, 106, 428 S.E.2d 294, 300 (1993), and the "equities of the entire case," Davis v. Davis, 8 Va. App. 12, 17, 377 S.E.2d 640, 643 (1989).

Levick chose to extensively litigate the validity of the marital agreement, only to concede that he was bound by it, followed by an attempt to retract that concession. Only after this extensive (and unsuccessful) challenge to the marital agreement's validity did Levick switch to the legal theories that ultimately prevailed. The trial court, while noting that it did not charge Levick with bad faith, stated from the bench that Levick could have raised the validity of the marriage "at the beginning of this litigation and Mrs. MacDougall would not have had to spend several hundred thousand dollars in litigating marital related issues before we get to the validity of the marriage." The trial court also heard evidence concerning the significant disparity in resources available to Levick and to MacDougall. The court rejected Levick's argument that MacDougall had refused to negotiate in good faith or adopted positions that increased the cost of litigation. Moreover, it is hardly surprising that MacDougall contested Levick's claim that the marriage was void. MacDougall's arguments, even if unsuccessful, were hardly frivolous.

VII. APPELLATE ATTORNEYS' FEES

Finally, both parties request attorneys' fees for their efforts on appeal. Regarding MacDougall's appeal, the parties have "addressed appropriate and substantial issues" and have not "generated unnecessary delay or expense in pursuit of [their] interests." Estate of Hackler v. Hackler, 44 Va. App. 51, 75, 602 S.E.2d 426, 438 (2004). We conclude that an award of fees is not justified as to that appeal. Our review of the grounds raised in Levick's appeal, however,

leads us to conclude that appellate attorneys' fees are justified. Accordingly, we remand the case

to the circuit court for an assessment of the fees that MacDougall incurred in defending Levick's

appeal.

CONCLUSION

We affirm the judgment of the trial court.[19]

<u>Affirmed and remanded.</u>

---

[19] Unlike the trial court, we conclude that the parties' marriage was voidable rather than void *ab initio*. This difference in reasoning may affect future cases involving a similar defect in the formation of a marriage, but it does not affect in practical terms the outcome of this case.